The appeal by the state is sustained.

No. 29,252.

THE STATE OF KANSAS, ex rel. WILLIAM A. SMITH, Attorney-general, *Plaintiff,* v. DON C. McCOMBS, DAVID M. BODDINGTON and GEORGE T. DARBY, Constituting the Board of Commissioners of the City of Kansas City, *Defendants.*

(284 Pac. 618.)

Opinion filed February 8, 1930.

*William A. Smith,* attorney-general, for the plaintiff; *E. S. McAnany, Maurice L. Alden, Thomas M. Van Cleave, William Drennan* and *Louis R. Gates,* all of Kansas City, of counsel.

*L. S. Harvey,* city attorney, *Clyde C. Glandon* and *John C. O'Brien,* assistant city attorneys, for the defendants.

The opinion of the court was delivered by

DAWSON, J.: The state brings this action to require the mayor and commissioners of Kansas City to comply with the request of the board of public utilities of that municipality to issue and sell $200,000 of bonds to raise funds to defray the cost of constructing a water flume or flow line across the city from its pumping plant on the north to a storage reservoir on the south, which improvement the utility board has decided is requisite to serve the necessities of that part of town.

The board of public utilities was created by authority of chapter 126 of the Laws of 1929. This statute provides that in cities of more than 100,000 inhabitants a board of five persons elected at

large, and serving at nominal salaries, shall have control of the municipal water and light plants, thus superseding the control of such utilities heretofore vested in the governing body of the city and under the particular supervision of the commissioner of water and light. The new statute authorizes this utility board, upon its determination of the necessity or expediency therefor, to request the mayor to call an election to submit to the electors a proposition to vote bonds to raise funds for the construction, extension or improvement of the municipal water plant or light plant, with the proviso—

"That if bonds have been authorized by an election but not issued at the time this act takes effect, such bonds may be issued without a further election, at the request of the board of public utilities." (§ 12.)

Some years ago Kansas City voted $2,000,000 bonds for some such purposes, of which amount $750,000 has not been sold, and it was the theory of the utility board that $200,000 of these bonds could be issued under the proviso above quoted to raise the wherewithal to construct the proposed cross-town flow line which gives rise to this action.

Because of many complicated legal questions affecting the government of Kansas City to which the enactment of this statute and the creation of this new board have given rise, the mayor and commissioners, on advice of counsel, declined to issue the bonds, in the hope that these might be solved or simplified by this court in this action in mandamus. That hope can only be partially realized in one lawsuit. We will consider and decide what questions are necessarily involved in this case, but it will be our purpose to hold the cause as nearly as practicable within the compass of what is directly involved. To attempt to dispose of all the complications suggested by counsel as arising from the enactment of this statute of 1929 would require us to write a treatise on the municipal government of Kansas cities of more than 100,000 population. We have not time for such a task and it would be but dictum when completed.

Immediately concerned with this case are certain constitutional objections and anomalies of statutory construction which defendants present to justify their refusal to issue the bonds as requested by the utility board under authority of this statute of 1929.

It is first contended that the title to the act does not clearly express its subject matter, and that it contains more than one subject, both of which defects would render it invalid under section 16 of article 2 of the constitution. The title to the act reads:

"An act relating to municipally owned water and light plants in certain cities, and creating a board of control, construction, operation and management thereof."

Whatever details of the act may not comport with that title, it can hardly be denied that the title is fairly indicative of its main purpose. That such a title fulfills the constitutional requirement has often been decided. In *In re Sanders, Petitioner*, 53 Kan. 191, 36 Pac. 348, it was said:

"It is not necessary that the title to an act should be a synopsis or abstract of the entire act in all its details; it is sufficient if the title indicates clearly, though in general terms, the scope of the act." (p. 198.)

See, also, *Rural School District v. Davis*, 96 Kan. 647, 152 Pac. 666; *Bourke v. Dickson*, 115 Kan. 71, 222 Pac. 94.

Without anticipating a decision as to the validity of some challenged details of the statute, it should be stated—as this court has often done heretofore—that the constitutional inhibition against the incorporation of more than one subject in a single act of the legislature is never to be construed in a narrow or technical sense, but rather the contrary. Whatever details are germane to the principal subject matter of a statute or incidental thereto may properly be incorporated. This rule for construing the constitutional inhibition against more than one subject in one act has been illustrated thus:

"Look at the general act of 1876 relating to public education (ch. 122). Its title is, 'An act for the regulation and support of common schools.' Under this simple title there lies the entire statutory foundation of our public-school system, covering not only such matters as schools and school districts, and school officers and their duties, but matters so distantly related thereto as the disposition of the federal land grants for school purposes, and including such details as the mode of settlement and acquisition of school lands, duties of the state auditor and governor in relation to the issue of land patents, criminal proceedings and penalties for waste or trespass on school-land properties, etc. But though the title to this act gives no hint of these far-reaching details, yet because they are mere details of the general scheme of the act for the effective regulation and support of common schools, and are germane and pertinent to the principal purpose of the act, they are not subject to constitutional infirmity under section 16 of article 2." (*City of Wichita v. Sedgwick County*, 110 Kan. 471, 473, 204 Pac. 693.)

Counsel for defendants cite many cases of this court holding unconstitutional certain provisions of statutes, enacted under restricted titles. Typical of these is *Comm'rs of Sedgwick Co. v. Bailey*, 13 Kan. 600, where the title to the statute reads "An act amendatory

of and supplemental to an act entitled 'An act defining the boundaries of counties,' approved March 3, 1868." The body of the act concerned itself with delimiting the boundaries of Reno, Kingman and Harvey counties, most of the territories of which were detached from what had theretofore been included in Sedgwick county. But section 6 of the statute went on to prescribe duties to be performed by the county clerk of Sedgwick county in the matter of certifying the amount of taxes to be imposed on Harvey county to pay its proper share of the bonded debt of Sedgwick county, and providing for remitting the taxes thus collected to Sedgwick county. It is not surprising that, according to the rather technical standards of interpretation of fifty-six years ago, this court held that the matter covered by section 6 of the statute (Laws 1872, ch. 97) was neither expressed nor fairly indicated in the title and therefore void. While rules of statutory construction are less rigorously applied nowadays than in 1874, it would be difficult to-day to discover any substantial relevancy between the matter of delimiting the boundaries of certain counties and the matter of prescribing administrative duties to be performed by county officials of Sedgwick and Harvey counties. Some practical rules for testing the sufficiency of titles to legislative enactments may be deduced from the many cases cited by counsel, to this effect: The more general the language of the title the broader the subject matter of the act may be with due deference to the constitutional requirement of section 16 of article 2. (*Division of Howard Co.*, 15 Kan. 194; *State v. Barrett*, 27 Kan. 213; *State v. Scott*, 109 Kan. 166, 197 Pac. 1089.) The more restrictive the title the more the matter which may properly be included within the body of the act is likewise restricted. (*State, ex rel., v. Bankers, etc., Ass'n*, 23 Kan. 499.) The title may be broader than the act itself, but the act may not be broader than the title. (*Ash v. Thorp*, 65 Kan. 60, 68 Pac. 1067; *State, ex rel., v. Reno County*, 98 Kan. 648, 650, 158 Pac. 861.)

Objection to the act is based on its extreme artificiality, applying only to cities of more than 100,000 inhabitants which own their waterworks and electric light plants. It is contended that such artificiality of classification of cities makes it obvious that it can apply to Kansas City alone, which would show the act to be violative of another paragraph of the constitution (art. 12, § 1) which forbids the legislature to pass special acts conferring corporate powers. We

have had to consider this constitutional point many times with respect to enactments of major concern to Kansas City. In *Baird v. City of Wichita*, 128 Kan. 100, 276 Pac. 77, it was said:

"Another objection to the act is based upon its being limited to cities of more than 95,000 population, but that classification is manifestly not unreasonable. Under the inhibitions of our state constitution it was and is impossible to confer corporate power upon a single city by special act (art. 12, § 1), yet of necessity our leading metropolis, Kansas City, does require much legislative attention not demanded by smaller municipalities, so a classification of cities is resorted to, quite properly, which satisfies the constitutional requirements of article 2, section 17, and article 12, section 1, although but one city may come within the legislative classification at the time the statute is enacted. This was precisely the situation when R. S. 13-1041 was enacted in 1921. At that time only Kansas City had more than 95,000 population. But now the city of Wichita has grown into the same class, and doubtless Topeka will attain thereto ere long. With the passing years there is no reason to doubt that other Kansas towns will reach the same standard." (p. 104.)

See, also, *State, ex rel., v. Kansas City*, 125 Kan. 88, 262 Pac. 1032.

Counsel for defendants also project the proposition that the act under consideration violates the spirit of section 5 of article 12 of the constitution, which authorizes the organization of cities for purposes of local government but requires that the corporate powers granted to such cities shall not be abused. It is difficult to see how this constitutional provision is trenched upon by the statute. In *City of Winfield v. Court of Industrial Relations*, 111 Kan. 580, 207 Pac. 813, the transfer of governmental control of a public utility from the city to a state board was under consideration. This court said:

"The state creates governmental officers and agencies, clothes them with authority, alters that authority, resumes it and imposes it on other functionaries as experience may suggest. A good example of this is found in the creation of the board of railroad commissioners in 1883. That board was given regulatory authority over railroads, the only public utilities of importance in Kansas at that time. That board was abolished in 1898. It was recreated with the same or increased powers in 1901. The board and its functions were merged in the public utilities commission created in 1911. This commission was abolished in 1920, and its duties and powers conferred on the court of industrial relations created at that time. In 1921 the public utilities commission was reëstablished and reinvested with all its functions, which included most of the duties and powers vested in the board of railroad commissioners by the act of 1901." (p. 583.)

And so here. Municipal ownership of public utilities is new, the

more modern utilities at least; consequently legislation for their management is bound to be empirical, and subject to frequent change as experience dictates; and the transfer of the control of the water and light plants from the general control of the city government to a special board having no other municipal concerns to attend to is quite a proper exercise of experimental legislation. If it succeeds, good and well; if not, the legislature has plenary power to try something else or restore control to the governing body of the city.

An objection to the statute is that it disrupts the civil service in Kansas City. That does not clearly appear. True, the statute takes from the governing body and the commissioner of water and light the power to hire and discharge employees and vests that power in the new board; but the statute does not expressly state—and it may not be correct to infer—that all the employees of the water and light departments heretofore under civil service regulations are outside those regulations now. Another answer to this objection is that there is no constitutional sanctity in the civil service act. If the new statute has demoralized the civil service in Kansas City that may be a matter of regret. It does not affect the validity of the act under present consideration. A statute is not unconstitutional because it may be impolitic or ill-advised. Whatever effect the substitution of a board of five men for a single commissioner to manage the light and water works of Kansas City may have had on the local civil service, no such consideration will excuse the defendant mayor and commissioners from putting on the market a couple of hundred thousand dollars' worth of bonds to construct the needed flow line to supply the city with water.

Another objection to the statute is that it abolishes the office of commissioner of water and light when the new board of public utilities is inducted into office. But does it? A superficial reading of part of section 15 of the act is certainly to that effect. But it may be well to scrutinize its full text:

"§ 15. That in all cities governed by the commission form of government the office of water and light commissioner is hereby abolished upon the organization of said board of public utilities, and all duties devolving upon the water and light commissioner relating to said departments shall be exercised and performed by the board of public utilities." (Laws 1929, ch. 126.)

It must be noted that it is only the duties heretofore devolving upon the water and light commissioner relating to said departments

—water and light departments—that are to be exercised and performed by the new board. It is rather obvious that this statute has no concern with other duties imposed by other statutes on the commissioner of water and light. The general governing body of Kansas City is its mayor-commissioner and four other commissioners. (R. S. 13-1707; 13-1807.) These constitute the city's local legislature; they confirm certain appointments to office (13-2101), remove derelict officers (13-2103), remit fines, grant reprieves and pardons for municipal offenses (13-1901), and have supervisory control of the varied public concerns of the city. Manifestly the legislature did not intend that the governing body of Kansas City shall hereafter be comprised of four commissioners instead of five, nor that the new board of public utilities shall serve as substitute for one of the commissioners in the enactment of ordinances and in the performance of other governmental functions vested in the city commission. So without foreclosing this particular point and assuming that so much of section 15 of the act as undertakes to abolish the office of one of the commissioners of Kansas City is invalid because neither expressed in the title nor germane to the expressed subject matter of the act, it must be obvious, we think, that such constitutional infirmity in section 15 neither invalidates the statute as a whole nor does it relieve the governing body of Kansas City, defendants herein, from complying with its duty to sell some bonds so that the new board can get on with its work of building the needed flow line.

Another objection to the statute is that it provides (section 13) that any bonds issued under its authority "shall be a direct lien upon the waterworks, payment of which shall be guaranteed by the city at large." The idea was broached in oral argument that such a provision might some time lead to a bondholders' suit, a sale in foreclosure, and a receivership for the city's water plant. That possibility is very remote. On a substantially similar point, where the absence of a bond to secure the payment of labor and material supplied for the improvement of the Sedgwick county courthouse had the legal effect of imposing a lien on the courthouse itself, this court said:

"Of course the sale of a county courthouse in foreclosure of a materialman's lien is only to be regarded in a Pickwickian sense. The sheriff will hardly go the length of turning the county officers into the street and putting the purchaser in possession. At the proper time, unless the plaintiff's judgment is

otherwise satisfied, mandamus will lie to compel payment or the imposition of a levy to raise the wherewithal to pay it." (*Huttig Millwork Co. v. Randel*, 125 Kan. 744, 745, 266 Pac. 106.)

It is also contended by defendants that the bond election of 1923, in which the electors of Kansas City authorized an issue of $2,000,000 to raise money "for the purpose of extensions and betterments of the waterworks plant, for the purpose of supplying said city and its inhabitants with water," was defective in that the ballot contained a dual proposition—one concerning betterments and another concerning extensions. It is suggested that the voters should have had the privilege of voting for or against an issue of bonds for extensions, and the separate privilege of voting for or against an issue of bonds for betterments. And it is further suggested that the voters should have had the privilege of voting for or against a specific and separate amount of bonds for each of these two purposes. It need not be debated that among our earlier decisions not readily distinguishable from the case at bar some will be found which give some potency to this objection (*Leavenworth v. Wilson*, 69 Kan. 74, 76 Pac. 400), but our more recent decisions are decidedly to the contrary. In *Pittsburg Board of Education v. Davis*, 120 Kan. 768, 245 Pac. 112, the question was whether a ballot used at a bond election was legal which submitted to the electors as a single proposition the following:

"Shall the board of education of the city of Pittsburg, Kansas, issue its bonds in the sum of $450,000 for the purpose of purchasing sites for school buildings, and for the purpose of constructing additions to school buildings, and for the purpose of constructing new school buildings in the city of Pittsburg, Kansas?" (p. 769.)

The court held that the proposition was essentially single and need not be divided. We think the same ruling must be made in this case. (*Thomas v. Covell*, 119 Kan. 684, 240 Pac. 574.) Moreover, if the sufficiency of the ballot submitted to the voters at the bond election in Kansas City in 1923 were a close question, this court would hesitate to denounce it after one and a quarter million dollars' worth of bonds had been sold under sanction of that election and the certification of the city officials. Technical questions as to the validity of a bond issue should be raised early or waived—for the good of the municipality itself as well as for the protection of those who invest in the bonds. (*Finnup v. School District*, 94 Kan. 695, 146 Pac. 349; 148 Pac. 245.)

The point is also made by the defendants that the bond issue authorized by the election in 1923 was to raise money for the purpose of extensions and betterments of the waterworks plant, that the terms "extensions" and "betterments" were well defined in contemporary statutes, and that the projected flow line does not fall within the category of either an extension or a betterment. This is rather critical. But note particularly the proposition submitted to the voters. The proposed issue of $2,000,000 in bonds was "for the purpose of supplying said city and its inhabitants with water" as well as for extensions and betterments. It is quite correct that bonds voted or taxes levied by a municipality for one purpose cannot be diverted to another purpose, but in devoting a part of the bond issue voted "for the purpose of supplying said city and its inhabitants with water" to the construction of the proposed flow line that rule of law is not violated.

Yet another objection to the statute of 1929 is the far-reaching effect it has upon many other statutory provisions pertaining to the municipal government of Kansas City. In the brief of counsel for defendants some seventy sections of various statutes are given with a synopsis of each of these which are more or less affected by the act of 1929. Manifestly we cannot go into these in detail. Here it must suffice to repeat what has often been said before—that the last expression of the legislative will is paramount; that older provisions of statute which cannot be harmonized therewith must give way; that older provisions are frequently amended or repealed by implication through the enactment of later legislation; and that the constitutional provision which requires that amendments to existing sections of statutes can only be made by entirely rewriting them, pertains to amendments directly intended and not to amendments or modifications of existing statutes which merely result from the existence of later independent legislation. (*Parker-Washington Co. v. Kansas City,* 73 Kan. 722, 85 Pac. 781; *State, ex rel., v. Rural High-school District,* 126 Kan. 166, 267 Pac. 2.)

And here, to keep this opinion within reasonable compass, our discussion of the validity of the statute of 1929 and the duty of the defendants in relation thereto must close. The many other arguments advanced by counsel have not been overlooked. Those arguments are by no means captious. The intrusion of a new board to manage the municipal light plants in Kansas City independently

of the city government is somewhat of an anomaly. Whether it shall turn out to be wise and practicable can only be determined by experience. But it was within the power of the legislature to enact the statute; and we must hold that the statute does not contain the constitutional infirmities urged against it. Neither are the reasons so ably urged against the issuance of the writ sufficient in our judgment to justify us in withholding it. It follows that judgment must be entered for plaintiff and the writ of mandamus allowed as prayed for.

It is so ordered.

HARVEY, J., not sitting.