No. 32,831

Joseph E. Seely, *Appellee* and *Cross-appellant,* and Security National Bank, *Appellee,* v. Board of Public Utilities of Kansas City, *Appellant,* and The City of Kansas City, *Cross-appellee.*

(57 P. 2d 471)

Opinion filed May 9, 1936.

*William Drennan, Otto Ziegelmeyer* and *C. W. Lowder,* all of Kansas City, for the appellant.

*Fred Robertson, Edward M. Bodington* and *J. O. Emerson,* all of Kansas City, for appellees Joseph Seely and Security National Bank; *Alton H. Skinner, John C. O'Brien, James K. Cubbison* and *William H. Towers,* all of Kansas City, for appellee City of Kansas City.

The opinion of the court was delivered by

Dawson, J.: This was an action for damages for injuries sustained by plaintiff, Joseph E. Seely, by coming in contact with a broken high-tension wire of the municipal light and power plant in Kansas City.

In a certain section of Kansas City there is a street named Willard avenue, which runs east and west. It is intersected by Wood-

land avenue, which runs north and south. In the block immediately east of Woodland and north of Willard is an alley fifteen feet wide. About forty feet north of Willard, in this alley, on July 6, 1934, there stood an elm tree, whose trunk was about eighteen inches from the alley's west line. Its foliage extended nearly across the alley. Some ten feet north of the tree stood a garage belonging to one Marlow, whose residence fronted westward on Woodland avenue. This garage encroached about two feet into the alley. Across the alley to the east and fronting southward on Willard avenue was the cottage home of a family named Phalp, in which was a grown daughter, Margaret, who owned a small dog. Running north and south in the alley and near its west line were poles and wires of the municipal light plant. Two of these wires carried high voltage.

In the night of July 5 or the early hours of July 6, 1934, a storm over the city had broken a number of the wires of the municipal plant. One of the high-voltage wires in this alley was thus broken. One of its broken ends was lodged in the elm tree and hung within a foot or two of the ground. Several persons in the vicinity had reported the broken wire, but defendant's linemen had not gotten around to repair it when the accident occurred which gave rise to this lawsuit.

Between 9 and 10 o'clock in the forenoon, the dog belonging to Margaret Phalp was stunned by an electric shock from this broken wire. Perhaps another dog had a similar mishap that morning. Miss Phalp's dog lay near the elm tree for some time, then began to kick and howl, and eventually arose and crossed the alley and concealed itself, still howling, under some bushes near the Phalps' cottage. A neighbor, Mrs. Marlow, called to Miss Phalp that her dog had gotten into the wire. Miss Phalp came out of her home and called across Willard avenue to plaintiff, who was then coming from his home to enter his automobile. He had heard the dog's howling, and came across the street. He walked up the alley, peering under the branches of the elm tree to look at the dog. He testified:

"And I saw a dog underneath the bush there, and straightened up; I had been leaning forwards, and as I straightened up it just seemed like a wasp stung me on the back of the head. That is my recollection, just a sting."

. . . . . . . . . . . .

"Next thing I knew I woke up in the hospital."

Margaret Phalp testified:

"He walked up the alley, . . . he just walked right into the wire. He . . . raised his hand up and it seemed like he was just in the wire.

. . . He had his back to me. . . . He threw up one of his arms, I don't know which one, and all at once I just saw him falling back, and he was holding the wire some way. . . . The wire was spitting, and his neck was burning, and his hands were burning. . . . and he was perspiring and was rather a greenish color and he kind of foamed at the mouth. His neck was badly burned. . . . I ran into the house and when I came back Mrs. Seely had a pole in her hand; she swung the pole and knocked the wire from his hand."

Plaintiff's injuries were various and serious; his arms were so badly burned that both had to be amputated below the elbows; he suffered other painful burns and was confined to a hospital for several months; and was permanently incapacitated to follow either of his several vocations, which were those of a laborer, machinist, and farmer.

There was testimony for defendants that a Mrs. Marlow was standing near the elm tree when the Phalps' dog lay there, and that when plaintiff came she warned him not to touch the wire, and that he said, "It is all right. I know how to handle it." Another witness for defendants, a Mrs. Lloyd, testified that she warned plaintiff not to touch the wire and he answered: "I am an electrician," and took hold of the wire with both hands. She testified, however, that she did not hear Mrs. Marlow say anything to plaintiff before he took hold of the wire. The testimony of this witness was somewhat shaken on cross-examination. Miss Phalp testified that she heard Mrs. Marlow say something like "Don't touch it," but it was about the time that the wire touched Mr. Seely; so it was not established that plaintiff heard any warning before he "mosied up to the wire" as one witness testified. Another witness for defendants, Billy Landry, eleven years old, testified that he was on the scene when the Phalps' dog was "twisting around on the grass." He testified on direct examination that he heard Mrs. Marlow say to plaintiff, "Don't touch it." But on cross-examination he testified that when plaintiff came to the elm tree Mrs. Marlow said to him, "Hello," and that he replied, "Hello," but that later she screamed at him, which might be true, but too late to effect a warning. This young witness failed to remember certain matters which would have tended to test his veracity, and concluded by testifying that he did not wait until plaintiff was rescued from the live wire by Mrs. Seely, and that after plaintiff fell back into the alley he "beat it."

The foregoing testimony is not set down as a comprehensive summary of the evidence but to throw some light on the jury's special findings which appear below.

At the conclusion of plaintiff's evidence both defendants interposed demurrers. The demurrer of the city of Kansas City was sustained; that of the board of public utilities was overruled.

The jury returned a verdict for $22,000 in favor of plaintiff. Some of the special questions answered were these:

"3. Did Mrs. Marlow see the Phalp dog when it came in contact with and was knocked down by the said wire? A. No.

"4. Do you find from the evidence that Billie Landry came to the rear of the Marlow lot before the said dog left the place where it was lying, after being knocked down by said wire? A. No.

"5. Do you find from the evidence that Mrs. James Lloyd was present at or near the rear end of the Marlow lot before the Phalp dog left the place where is was lying after being knocked down by the wire in question? A. No.

"6. If you find that Mrs. Marlow was present, then state if Mrs. Marlow warned the plaintiff not to touch the wire, not to pick it up? A. No.

"7. Did the plaintiff take the said wire in his hands after being warned by Mrs. Marlow? A. No.

"8. Do you find from the evidence that Mrs. James Lloyd warned the plaintiffe, Seely, not to touch the said wire? A. No."

The usual post-trial motions were presented and disposed of, and judgment was entered on the verdict.

The board of public utilities of Kansas City appeals. Plaintiff has filed a cross-appeal from the ruling on the city's demurrer to plaintiff's evidence.

The principal question in the appeal and cross-appeal is whether the board of public utilities is independently liable for plaintiff's injuries, or does that liability rest on the city itself, or should it be imposed on both defendants.

But before examining that question, we must consider certain trial errors complained of by the board of public utilities. When the trial was about to start the suggestion was made that all the witnesses be sworn and excluded from the courtroom until their presence was required. As the witnesses arose and held up their hands to be sworn, an attorney for plaintiff in a loud voice addressed his client, saying, "Mr. Seely, stand up and hold up the stump of your right arm." Counsel for defendants objected to this remark and asked that plaintiff's counsel be admonished, and suggested that the jury be discharged. Another objection of counsel for defendants to the conduct of plaintiff's counsel during the preliminaries were his references to the fact that plaintiff was the father of four children. Defendants' counsel also objected to the presence of the children in the courtroom: The record reads:

[Counsel for Defendants]: "I move at this time for an order of the court directing plaintiff's attorneys to exclude the minor children of the plaintiff from the room during the entire trial, for the reason that the presence of the children in the room during the trial will be prejudicial to the rights of the defendants herein, and for the further reason that this action is for damages and injuries to the plaintiff, and not to his children or any member of his family."

The trial court declined to exclude the children from the courtroom; ignored the suggestion that the jury be discharged, but after the witnesses were sworn and excluded, said:

"Before we start in this particular lawsuit I want to make this observation to counsel, that because there is considerable involved on both sides of this lawsuit, I am going to request both counsel to be very careful in the conduct of the case so that no prejudicial error will be committed by either side. Now, as to all remarks made by either counsel during the course of the trial, try to limit them only to the propositions involved; and I hope there will be no controversy across the counsel table when objections are made or otherwise. . . . I am going to tell you ahead of time I am going to insist that only the legal procedure be followed by both sides."

We think the trial had scarcely proceded far enough so that the incidents complained of could be characterized as erroneous; and it would seem that the timely admonition given by the court was sufficient at that early stage of the proceedings.

Another complaint of defendants relates to the closing arguments of plaintiff's counsel in which he commented severely on the testimony of certain witnesses for defendants. This court has no means of determining whether the testimony of plaintiff's witnesses was true, and that of defendants' witnesses was false, or vice versa; but certainly the one line of testimony or the other was false. Both could not possibly be true; and counsel committed no error in dealing plainly with what reasonably appeared to him to have been false testimony deliberately avowed by defendants' witnesses. (*Hausam v. Poehler*, 120 Kan. 119, 122, 242 Pac. 449.) In *State v. Wilson*, 108 Kan. 433, 195 Pac. 618, which was a criminal case, this court discussed the scope within which an argument to the jury may fairly extend:

"Of course, counsel should not introduce or comment on facts outside of the evidence, but reasonable inferences may be drawn from the evidence, and figurative speech which has a foundation in the testimony, is permissible. The argument of counsel for the state included illustration, comment on the effect of the crime charged, some denunciation and some pathos and appeal, but we cannot say that there was no basis in the evidence for these features nor that

there was prejudicial error in the limits placed on the argument by the court. Considerable latitude should be allowed in an argument to a jury and unreasonable limitations should not be imposed on counsel. (16 C. J. 893.) It is common and competent for an attorney in presenting a case to a jury to indulge to a reasonable extent in illustration and imagery in denunciation of wrong and crime, in wit and sarcasm in an analysis of the testimony and thus aid in pointing the way to a just and correct result. Many times there are exaggerations in the heat of the discussion, but these are usually taken by the jury at their worth and are rarely deemed sufficient to require the overthrow of a verdict." (p. 437.)

See, also, 64 C. J. 249, 250, *id.* 267-269, 274-276.

Complaint is also made because in their arguments to the jury counsel for plaintiff suggested how the special questions should be answered, and the jury did answer them accordingly. The record does not show that defendants interposed any objection to this line of argument. The suggested answers were based on counsel's view of the testimony of some of defendants' witnesses—that such testimony was not entitled to credence. Such a line of argument did not transcend the limits of fair debate. (*State v. Wilson,* supra; *Foley v. Crawford,* 125 Kan. 252, syl. ¶ 5, 264 Pac. 59.)

Another contention is that plaintiff's evidence as to how his injuries occurred "is so impossible, unreasonable, absurd and contradictory that it does not constitute a basis for the verdict in his favor, and the trial court should have instructed a verdict for the defendant." To this court plaintiff's evidence does not appear open to such emphatic animadversion. Surely it could happen that plaintiff could have "mosied" into the broken live wire if he did not know of its presence in the elm tree, and all that happened after he did come in contact with the wire was inevitable and altogether too quickly for a belated warning to have prevented the accident. Indeed, a good argument could be made that the accident could scarcely have happened except in some such fashion. If plaintiff had been an electrician he would certainly have known that he dare not touch the wire without the necessary equipment for handling it. Defendants' witnesses, who were a couple of housewives, knew that much. And if he was merely a common workman, what could have been his object in deliberately taking hold of the wire? What could he have intended by doing so? He could not repair it with his bare hands. Being presumably in his sane mind he surely did not intend to take charge of the broken end of the wire and hold it until defendants' linemen came to repair it. The jury quite rationally

could decide that plaintiff's version of the facts was more credible than defendants'; and this assignment of error cannot be sustained.

Defendants produced as an expert witness a professor of electrical engineering who testified in substance that if plaintiff had a dry cap on his head and if his hair was dry and if his feet and shoes were dry and it was dry underfoot, the accident could not have happened as testified to by plaintiff. He testified that if the electric wire had first come in contact with plaintiff's head he would have been para-lyzed instantly, and would have fallen forward, not backward, and that it probably would have killed him. However, the same live wire did not kill Miss Phalp's little dog; and if there was another dog shocked that morning by the same wire, as testified to by some of defendants' witnesses, it was not killed. Moreover the testimony was clear and not disputed that the insulation on the wire was frayed and worn; and this expert witness testified that in such a condition the high voltage might be partly dissipated in the branches of the elm tree, so that plaintiff would not receive the full strength of the current. Be that as it may, the evidence was for the jury to appraise, not for this court—under any rule of appellate review with which we are familiar.

It is next argued that the verdict for $22,000 was a quotient verdict, but that does not appear. Indeed the argument for appellant on this point concludes thus, "That the circumstances *almost* conclusively show that the jury's verdict" was arrived at by a quotient of divergent amounts. "Almost," but not altogether apparently, so this basis of error evaporates.

The foregoing disposes of the run-of-the-mill trial errors, and it is quite clear to this court that prejudicial error in none of them is made to appear.

Coming now to the one serious question invoked in the appeal and cross-appeal, counsel for the board of public utilities contends that it is not such a complete and separate entity from the city of Kansas City that it can be subjected to a judgment for damages for negligence. Counsel for plaintiff's cross-appeal is a precautionary one, so that if the contention of the court is sustained their client's judgment will not be imperiled by acquiescing in the trial court's ruling which relieved the city itself from liability.

The relationship of the board of public utilities of Kansas City to the city itself has been the subject of judicial consideration here-

tofore. (*State, ex rel., v. McCombs*, 125 Kan. 92, 262 Pac. 579; *State, ex rel., v. McCombs*, 129 Kan. 834, 284 Pac. 618; *Board of Public Utilities v. Kansas City P. & L. Co.*, 139 Kan. 842, 33 P. 2d 320; *Puhr v. Kansas City*, 142 Kan. 704, 51 P. 2d 911.) In these cases the various phases of the statute which creates a separate official board for the management, operation and control of the municipal water and light plant of Kansas City were applied to the particular legal questions requiring decision. The statute, as it now appears, is R. S. 1933 Supp. 13-1220 *et seq.* In *State, ex rel., v. McCombs*, supra, in commenting on this statute, this court said:

"Municipal ownership of public utilities is new, the more modern utilities at least; consequently legislation for their management is bound to be empirical, and subject to frequent change as experience dictates; and the transfer of the control of the water and light plants from the general control of the city government to a special board having no other municipal concerns to attend to is quite a proper exercise of experimental legislation. If it succeeds, good and well; if not, the legislature has plenary power to try something else or restore control to the governing body of the city." (129 Kan. 839.)

Nowhere in the statute do we find a plain legislative declaration which relieves the city of damages to persons or property caused through the negligent operation of the electric-light plant, nor does the statute specifically transfer and impose such liability upon the board of public utilities as a wholly independent legal entity. The nearest the statute comes to this last point is in R. S. 1933 Supp. 13-1233, which provides:

"All other powers and duties under acts and parts of acts relating to waterworks and/or electric-light plants in such cities of the first class insofar as applicable shall be exercised by the board of public utilities."

In the case at bar it seems that the financial problem of paying the judgment in this case is not serious. It is said that the municipal plant is being operated at a profit and has a handsome surplus—which may or may not have been the legislative purpose in vesting proprietary powers in cities or other local administrative instrumentalities; but the question intrudes: Where would the plaintiff have the right to look for the payment of his judgment, if the municipal light plant had no surplus?—if it were being operated at a loss? It has no power to levy a tax to pay a judgment for damages. In the circumstances of this case, there would be no doubt of the city's liability if the municipal plant had been operated directly by the city's governing body as it was operated until a few

years ago. (*Kansas City v. Gilbert*, 65 Kan. 469, 70 Pac. 350; *Swayzee v. City of Augusta*, 113 Kan. 658, 216 Pac. 265; *Webb v. City of Chanute*, 118 Kan. 505, 235 Pac. 838. See, also, *Ross v. City of Gypsum*, 104 Kan. 412, 417, *et seq.*, 179 Pac. 348.) For negligence in the operation and management of such public utilities as are clearly of a proprietary character, the smaller cities of this state have uniformly been held liable. (*Emporia v. White*, 74 Kan. 864, 86 Pac. 295; *Hinze v. City of Iola*, 92 Kan. 779, 142 Pac. 947; *Stone v. City of Pleasanton*, 115 Kan. 378, 223 Pac. 312; *Bollinger v. Hill City*, 116 Kan. 604, 227 Pac. 265; *Zumbrun v. City of Osawatomie*, 135 Kan. 26, 10 P. 2d 3.)

In the light of these decided cases and many others in our official reports, can this court hold that while all other cities of this state having a municipal light plant are liable for negligence in their operation and maintenance, a city having more than 100,000 population which owns its municipal light plant (R. S. 1933 Supp. 13-1220) is not thus liable—for no better reason than that the legislature has created an administrative agency to operate the plant, free from control of the regular governing body of the city? Such a ruling would bring to the fore constitutional questions of no little gravity, the Kansas bill of rights, § 18; and the guaranties of the fourteenth amendment.

This court holds that the city of Kansas City was both a proper and a necessary party to this action, and that the board of public utilities was and is a quasi-legal entity properly impleaded in this action and sufficiently qualified to participate in this litigation (*Board of Library Directors v. City of Fort Scott*, 134 Kan. 586, 7 P. 2d 533), and to be guided by the judgment to the extent that it may satisfy the same out of its available surplus, failing which the city must provide for the payment of the judgment as in all cases where liability is judicially imposed on a municipality.

The judgment against the board of public utilities of Kansas City is affirmed, and the judgment in favor of the city of Kansas City is reversed with directions to enter judgment against it on the same terms as those already decreed against its codefendant. It is so ordered.