No. 33,574

THE CITY OF KANOPOLIS, *Appellant,* v. HELEN F. MOUNTAIN, *Appellee.*

(76 P. 2d 803)

Opinion filed March 5, 1938.

*Austin M. Cowan, C. A. McCorkle, W. A. Kahrs, Robert H. Nelson* and *Henry L. Butler,* all of Wichita, for the appellant.

*Earle W. Evans, Joseph G. Carey, W. F. Lilleston, George C. Spradling, Henry V. Gott, George Stallwitz* and *A. M. Buzzi,* all of Wichita, for the appellee.

The opinion of the court was delivered by

DAWSON, C. J.: The city of Kanopolis brought this action to recover or cancel a refunding bond of the city which it had entrusted to the custody of one R. E. Booth, Jr., a bond broker, who breached his trust and without right thereto delivered the bond to the defendant, Helen F. Mountain, as security for a debt he owed to her.

In 1933 the city of Kanopolis had an outstanding bond debt of some $25,000, which it determined to refund. There was no attorney resident in Kanopolis and it had no regularly employed city attorney. To procure the services of an attorney, the city council adopted a resolution—

"That the city clerk be authorized to employ an attorney at as reasonable

a figure as possible to take care of any and all legal matters pertaining to issuance of such bonds."

Pursuant thereto, V. E. Danner, of the law firm of Danner and Dulaney, of the near-by city of Ellsworth, was employed as attorney, and he set about the drafting of appropriate resolutions, ordinances, and publication notices pertinent to the refunding of the city's indebtedness. Shortly thereafter one R. E. Booth, Jr., representing himself as a bond broker, came on the scene, and entered into a written agreement with the city to handle the bond issue, to negotiate with the holders of the outstanding bonds for their exchange for bonds of the refunding issue, and to provide for the printing, registration, and to pay all legal expenses pertaining thereto, and to provide a transcript of the proceedings and any other requisite details— the agreed compensation for these services to be four percent of the total proposed refunding bond issue of $25,625. In making this agreement Booth had associated himself with Danner and Dulaney; but whether this agreement was intended to supersede the contract of employment of Danner as city attorney is not clear. Neither is the question raised whether Danner's participation in the city's contract with Booth had the effect of terminating his special employment as city attorney for the city.

Be that as it may, the proper proceedings leading up to the point where the refunding bonds were ready for registration by the state auditor had all been transacted in due form. The new bonds were dated and serially numbered; some of them, including No. 25, were in denominations of $1,000 each, and all were signed by the mayor and city clerk; and the city clerk certified on each bond that it had been duly registered in his office.

At this stage of the proceedings the city clerk delivered the bonds to R. E. Booth, Jr., who took them to Topeka, presented them and the pertinent transcript to the state·auditor, and that officer registered them, and on each bond he placed his official certificate reciting:

"OFFICE OF THE AUDITOR OF THE STATE OF KANSAS:

"I, Will J. French, auditor of the state of Kansas, do hereby certify that a transcript of the proceedings leading up to the issuance of this bond has been filed in my office and that this bond was registered in my office according to law, this October 31, 1933.

"Witness my hand and official seal.

(Seal) WILL J. FRENCH, *Auditor of the State of Kansas.*"

After such certification by the state auditor, Booth delivered one of the bonds, No. 25, for $1,000, to Helen F. Mountain, as partial security for a debt of $1,500 he owed her, which indebtedness had arisen because of Booth's conversion to his own use of some securities she had previously entrusted to him.

In this action plaintiff's petition alleged certain pertinent facts, and further alleged that when the bonds were delivered to Booth it was with instructions to deliver them to Attorney Danner at Ellsworth, so that Danner could take them to Topeka, together with a transcript of the proceedings, for presentation to the state auditor, and so that upon proper scrutiny and approval thereof that officer would register the bonds and certify thereto as the statute provides. Plaintiff further alleged that defendant knew or should have known that Booth did not own the bond in controversy and that he had no right to its possession; that defendant paid no consideration for it; that the bond was negotiable and that she was threatening to transfer it to persons who might claim to be innocent purchasers for the value without notice. Plaintiff's prayer was for the return of the bond or for its cancellation, or in the alternative for its value, and for an order restraining defendant from transferring or disposing of it.

The answer of the defendant admitted her possession of the bond and that it was negotiable, and that she had delivered to Booth certain securities of the value of $1,500 for the purpose of selling or exchanging them for others; that Booth had converted those securities to his own use, and had thereby become indebted to her for their value; and that Booth had sent his agent, one Dobbin, to her for the purpose of settling that indebtedness, and that Dobbin delivered to her the bond in controversy as collateral security, and that she accepted it as such.

Defendant further alleged that the bond was valid on its face, signed by the mayor and clerk of the plaintiff city, and bore the seal of the city and bore the certificate and seal of the state auditor, and that she had no information that Booth did not have good title to the bond at the time Dobbin, his agent, delivered it to her.

Plaintiff's verified reply denied that Dobbin was the agent of Booth and denied that Booth was the agent of plaintiff.

The cause was tried before a jury. The evidence took a wide range, and developed a controversy touching the purpose for which the bonds were entrusted to Booth, and revealed some inconsistency

between the city's evidence in this case and its verified pleadings filed in a prior inconclusive lawsuit in replevin for the possession of the bonds of this same refunding issue, but it may not now be necessary to critically examine those incidents.

The jury returned a general verdict for defendant, and answered special questions thus:

"1. Were the bond forms, after having been signed by the mayor and attested by the city clerk with the seal of the city, turned over to R. E. Booth, Jr., with instruction to deliver the same to V. E. Danner, of Ellsworth, Kan.? A. No.

"2. Did R. E. Booth, Jr., obtain the registration of said bonds by the state auditor without the consent of the city of Kanopolis? A. No.

"3. Did the defendant, at the time bond No. 25 was delivered to her, have actual knowledge that the title of R. E. Booth, Jr., was defective, if you find that it was defective? A. No.

"5. Do you find that defendant obtained the bond in question from R. E. Booth, Jr., or his agent or representative, in bad faith? A. No."

Judgment was entered accordingly, and plaintiff appeals, making various contentions, the first of which is that the bond which defendant now holds was not a complete and valid instrument when it was entrusted to Booth, and in consequence defendant is not entitled to the privileges of an innocent holder.

This contention is essentially a challenge of the long-established rule of "estoppel by recitals" which has given credit and marketability to Kansas municipal bonds, and to those of the country in general for the last sixty years, at least. A few of the early decisions of the United States supreme court on this subject are cited in *Board of County Commissioners of Day County v. State of Kansas*, 19 Okla. 375, 91 Pac. 699. In that case, among other defenses to plaintiff's action to recover on a series of judgment refunding bonds issued by the county, it was pleaded that the bonds were not issued pursuant to any law of Oklahoma Territory; that there was no session of court on the date of the judgment authorizing the refunding bond issue; that the county had no valid indebtedness to be refunded; that no notice was given of any intended action of the board of county commissioners to issue the bonds; that the bonds were issued in excess of the amount of indebtedness the county was authorized by statute to incur; and other objections of a like nature. The bonds themselves, however, contained a recital that they were issued under authority of a specified territorial statute. Another recital read:

"And it is hereby recited, certified and warranted, that all acts, conditions and things required to be done precedent to and in the issuing of this bond have been properly done and performed in regular and due form required by law." (p. 383.)

The bonds were signed by the chairman of the board of county commissioners, and attested with the signature and seal of the county clerk; and appended thereto was a certificate of their registration bearing the signature and seal of the auditor of Oklahoma Territory.

The court made short work of these pleaded defenses, thus:

"As to the effect of such recitals, and the fact that the plaintiff in error is bound thereby, see 62 U. S. 539, *Knox v. Aspinwall;* 99 U. S. 86, *Hackett v. Ottawa;* 105 U. S. 342, *Ottawa v. National Bk.;* 103 U. S. 683, *Walnut v. Wade;* 89 Fed. 619, *Waite v. Santa Cruz;* 65 U. S. 287, *Bissell v. Jeffersonville.*" (p. 406.)

Looking into some of the cases just cited, in *Commissioners of Knox County, Indiana, v. Aspinwall et al.,* 62 U. S. 539, 16 L. Ed. 208, the suit was to recover on certain interest coupons of a county bond issue. Various defenses were urged and disposed of, including the legal question whether the county had statutory authority to issue the bonds, and having answered that question in the affirmative, the opinion of the court continued:

"The bonds on their face import a compliance with the law under which they were issued . . . The purchaser was not bound to look further for evidence of a compliance with the conditions to the grant of the power." (p. 545.)

In *Walnut v. Wade,* 103 U. S. 683, 26 L. Ed. 526, which was a suit to recover on the interest coupons of an issue of township bonds in Illinois, the supreme court noted the fact that the bonds contained recitals averring that they were issued by authority of a specified statute and said:

"The plaintiff, therefore, being a bona fide holder, was not bound to look beyond the legislative act and the recitals in the bonds." (p. 695.)

In Rose's elaborate notes to the supreme court cases just cited, in 16 L. Ed. and 26 L. Ed., there is a wealth of later cases to the same effect, with no intimation that the potency of their ruling has been weakened with the lapse of time.

Our own cases are to the same effect. In *Finnup v. School District,* 94 Kan. 695, 146 Pac. 349, 148 Pac. 245, the action was to recover on certain bonds and their related coupons issued by a school district. The defense interposed was that they were issued without

authority, and were not issued in conformity with the statute cited in the text of the instruments. But this court said:

"A school district is liable to an innocent holder on its refunding bonds issued under chapter 50 of the Laws of 1879, where the bonds recite that all acts, conditions, and things required to be done precedent to and in the issuing of the bonds have been properly done, happened and performed in regular and due form as required by law, although there is a certificate of the district board accompanying the bonds, purporting to recite some, but not all, of the steps taken preceding the issuance of the bonds, the certificate not contradicting the recitals in the bonds." (Syl.)

In our recent case, *Board of Education v. Powers*, 142 Kan. 664, 669, 51 P. 2d 421, this court recognized that the rule still exists in all its potency although not applicable in that particular case, since the bonds had not yet gotten into the hands of an innocent holder. We said:

"We do not have before us a situation where by reason of delay in instituting action rights of third parties may have intervened. As was said in *State, ex rel., v. McCombs,* 129 Kan. 834, 284 Pac. 618:

" 'Technical questions as to the validity of a bond issue should be raised early or waived—for the good of the municipality itself as well as for the protection of those who invest in the bonds. (*Finnup v. School District,* 94 Kan. 695, 146 Pac. 349, 148 Pac. 245.)' (p. 842.)

"See, also: *The State, ex rel., v. Comm'rs of Kiowa County,* 39 Kan. 657, 19 Pac. 925; *The State v. Wichita County,* 62 Kan. 494, 64 Pac. 45; *South Hutchinson v. Barnum,* 63 Kan. 872, 66 Pac. 1035; *Ritchie v. City of Wichita,* 99 Kan. 663, 666, 163 Pac. 176, and Note 86 A. L. R. 1057, 1096." (p. 669.)

In *South Hutchinson v. Barnum,* 63 Kan. 872, 66 Pac. 1035, the city sought to resist a suit on certain matured interest coupons pertaining to an issue of its municipal bonds which had been acquired by an innocent holder, but this court said:

"The city council of a city of the third class is the authority designated by law to determine whether all acts precedent to its right to issue funding bonds have been performed, and a recital in a funding bond that all such precedent acts have been performed, certified to by its mayor and clerk, concludes the city in an action by an innocent purchaser of such bonds or the coupons detached therefrom. (Citations.)" (p. 875.)

To avoid the force of this array of precedents (which might be indefinitely multiplied) it is suggested that most, if not all, of the cases we have just cited were decided before the negotiable-instruments act became the law of this state. (Laws 1905, ch. 310; G. S. 1935, 52-101 *et seq.*) And counsel for the city direct our attention to section 22 of the act, which reads:

"Where an incomplete instrument has not been delivered, it will not, if completed and negotiated without authority, be a valid contract in the hands of any holder, as against any person whose signature was placed thereon before delivery." (G. S. 1935, 52-215.)

It was argued that the bond was negotiated to defendant by Booth before it was a completed instrument, and likewise without authority, consequently it was not a valid instrument in the hands of this defendant. But that argument would cast on defendant the responsibility of inquiring whether the recitals in the text of the instrument and in the certificates of the city clerk and the state auditor were true. That duty cannot be required of one who accepts the bond for a lawful consideration without notice of infirmities— if indeed there had been any infirmities. He may implicitly rely on its recitals. Moreover, the jury's findings, which were justified by the terms of Booth's contract with the city, as well as by the evidence inherent in the circumstances to which the jury gave credence, were to the effect that the bonds were not entrusted to Booth for delivery to Danner, who was to take them to Topeka for registration by the state auditor (finding No. 1), and that Booth did have the consent of the city to have that detail attended to himself (finding No. 2); so that the argument that the bond was incomplete when acquired by defendant cannot be sustained. Broadly speaking, municipal bonds are negotiable, as both parties to this action concede. (*State, ex rel., v. Comm'rs of Kiowa Co.*, 39 Kan. 657, 19 Pac. 925, and citations; 1 Jones on Bonds and Bond Securities, 4th ed., sec. 285 *et seq.*) But whether they are governed in all respects by the negotiable-instruments act, in view of the possibility that although fair on their face the municipality may have lacked statutory authority to issue them, is debatable. (See *Coquard v. Village of Oquawka*, 91 Ill. App. 648, 192 Ill. 355, 61 N. E. 660; *Phoenix Mut. Life Ins. Co. v. City of McAllen, Tex.*, 82 F. 2d 581.)

And in view of the terms of Booth's contract with the city and the jury's findings Nos. 3 and 5, the contention that the bonds were negotiated without authority is not maintainable against this defendant. Indeed, if Booth had faithfully carried out his contract with the city and had gotten hold of the older outstanding bonds in exchange for the new refunding issue, as he had agreed to do, and as the city had agreed to permit him to do, no one would have the hardihood to contend that he had negotiated them without authority.

And the foregoing conclusions render it quite superfluous to consider the power of the city clerk to delegate his duties to a subagent, or whether the contract between the city and Booth was legal, or any other questions which assiduous counsel have urged in behalf of the city.

The record contains no error, and the judgment is affirmed.