CITY OF WICHITA, KANSAS,
A Municipal Corporation,
Plaintiff,

v.

UNITED STATES GYPSUM COMPANY,
et al., Defendants.

Civ. A. No. 89–1331–MLB.

United States District Court,
D. Kansas.

July 14, 1993.

Charles P. Efflandt, Robert L. Howard, Foulston & Siefkin, Thomas R. Powell, Hinkle, Eberhart & Elkouri, Joe A. Lang, City of Wichita Law Dept., Wichita, KS, Edward B. Cottingham, Jr., Ness, Motley, Loadholt, Richardson & Poole, Charleston, SC, for City of Wichita.

Brett C. Coonrod, Spencer J. Brown, Keith A. Cary, Deacy & Deacy, Kansas City, MO, James D. Pagliaro, Morgan, Lewis & Bockius, Philadelphia, PA, for U.S. Gypsum Co.

William Hergenreter, Shaw, Hergenreter, Quarnstrom & Kocher, Topeka, KS, Marc A. Powell, Kahrs, Nelson, Fanning, Hite & Kellogg, Wichita, KS, Stephen E. Merrill, John T. Broderick, Mark E. Howard, Merrill & Broderick, P.A., Manchester, NH, for U.S. Mineral Products Co.

Richard C. Hite, Marc A. Powell, Kahrs, Nelson, Fanning, Hite & Kellogg, Wichita, KS, Kristine K. Kraft, C. Brooks Wood, Hillix, Brewer, Hoffhaus, Whittaker & Wright, Kansas City, MO, Robert D. Brownson, Stitch, Angell, Kreikler & Muth, Minneapolis, MN, for Asbestospray.

## MEMORANDUM AND ORDER

BELOT, District Judge.

This matter is before the court on the joint motion of defendants for partial summary judgment (Doc. 261); summary judgment (Doc. 157)[1]; and the motion of plaintiff for partial summary judgment. (Doc. 233). The City of Wichita ("the City") brings this action to recover damages for the costs of removing asbestos from two City buildings—the Century II Civic Cultural Center ("Century II")[2], and the Wichita Public Library. Plaintiff seeks recovery against defendant U.S. Gypsum Company as the manufacturer of asbestos products used in the construction of both buildings. Plaintiff alleges that asbestos products manufactured by the remaining two defendants—U.S. Mineral Products Company and Asbestospray—were used in the construction of the Public Library. Plaintiff seeks recovery under theories of negligence, strict liability, implied warranty, and fraud for defendants' alleged misrepresentations as to the characteristics and health hazards associated with their products. Plaintiff also seeks punitive damages.

Rule 56(c) of the Federal Rules of Civil Procedure directs the entry of summary judgment in favor of the party who "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

A principal purpose "of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses...." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). The court's inquiry is to determine "whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). Summary judgment is inappropriate if there is sufficient evidence on which a trier of fact could reasonably find for the nonmoving party. *Prenalta Corp. v. Colorado Interstate Gas Co.*, 944 F.2d 677, 684 (10th Cir. 1991).

The burden of proof at the summary judgment stage is similar to that at trial. "Entry of summary judgment is mandated, after an adequate time for discovery and upon motion, against a party who 'fails to make a showing to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Aldrich Enters., Inc. v. United States*, 938 F.2d 1134, 1138 (10th Cir.1991) (quoting *Celotex,* 477 U.S. at 322, 106 S.Ct. at 2552). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact by informing the court of the basis for its motion. *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2552. This burden, however, does not require the moving party to "support its motion with affidavits or other similar materials *negating* the opponent's claim." *Id.* (emphasis in original). Once the moving party properly supports its motion, the nonmoving party "may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256, 106 S.Ct. at 2514; *Shapolia v. Los Alamos Nat'l Laboratory*, 992 F.2d 1033, 1036, (10th Cir.

---

1. The court is able to rule on this motion with the aid of the briefs and therefore denies defendants' motion for oral argument (Doc. 190).

2. In the initial complaint, plaintiff referred to Century II as "the Century II Convention Center." In the First Amended Complaint, plaintiff designates the building as "the Century II Civic Cultural Center."

1993). The court reviews the evidence in a light most favorable to the non-moving party, *e.g., Washington v. Board of Public Utilities,* 939 F.2d 901, 903 (10th Cir.1991), under the substantive law and the evidentiary burden applicable to the particular claim. *Anderson,* 477 U.S. at 255, 106 S.Ct. at 2513.

## I. *Partial Summary Judgment* (Doc. 261)

Defendants seek partial summary judgment on plaintiff's claims based upon negligence, strict liability, and implied warranty.[3]

### A. *Negligence and Strict Liability*

Defendants contend that plaintiff has claimed damages only for economic loss, which are not recoverable under theories of either negligence or strict liability (tort claims).

■ Under Kansas law, a products liability plaintiff suing under a theory of negligence or strict liability may not recover damages for pure "economic loss." *Winchester v. Lester's of Minnesota, Inc.,* 983 F.2d 992, 995 (10th Cir.1993). In this context, "economic loss" is a term of art, and the rule does not literally mean that no plaintiff may recover for an injury to his pecuniary, economic interests damaged by the negligence of another. *See Ettus v. Orkin Exterminating Co.,* 233 Kan. 555, 665 P.2d 730 (1983) (negligent inspection for termite damage to house); *Brueck v. Krings,* 230 Kan. 466, 469–70, 638 P.2d 904, 907–08 (1982) (accountant negligence resulting in failed savings association); *Pancake House, Inc. v. Redmond,* 239 Kan. 83, 86, 716 P.2d 575 (1986) (attorney negligence for filing lawsuit); *Bollinger v. Nuss,* 202 Kan. 326, 449 P.2d 502 (1969) (negligent failure of insurance company to settle claim against insured); *Dodd v. Boles,* 137 Kan. 600, 606, 21 P.2d 364, 366–67 (1933) (negligent misrepresentation against seller of stock); *Monarch Normandy Square Partners v. Normandy Square Assocs. Ltd. Partnership,* 817 F.Supp. 908, 919 (D.Kan.1993); W. Keeton, et al., *Prosser and Keeton on Law of Torts* § 107, at 747 (5th ed. 1984)

(economic loss for negligent misrepresentation available to persons for whose use representation was intended); *but see Green Constr. Co. v. Kansas Power & Light Co.,* 732 F.Supp. 1550, 1552 n. 2 (D.Kan.1990).

Rather, the rule against recovery of damages for "economic loss" is generally seen as an attempt to demarcate a line between tangible physical property damage—which is not barred by the rule—as opposed to the intangible economic injuries of lost expectations or advantages normally associated with contract theories. *See Winchester,* 983 F.2d at 995–96; *AgriStor Leasing v. Meuli,* 634 F.Supp. 1208, 1217 (D.Kan.1986) (quoting *AgriStor Leasing v. Markley,* No. 81–4163, 1984 WL 2817 (D.Kan. June 8, 1984)). At times, the same result has also been reached by applying concepts of proximate cause or the remoteness of injury. *See Union Oil Co. v. Oppen,* 501 F.2d 558, 563 (9th Cir.1974); *cf. East River Steamship Corp. v. Transamerica Delaval Inc.,* 476 U.S. 858, 874, 106 S.Ct. 2295, 2303, 90 L.Ed.2d 865 (1986) (adopting economic loss rule and rejecting foreseeability as the only limitation for tort actions based on admiralty law). The distinction has been explained as a recognition that certain types of "economic losses" result from risks that contracting parties should be able to allocate among themselves, while the risk for other types of losses should rest with the defendant as a matter of law. *See 2000 Watermark Ass'n v. Celotex Corp.,* 784 F.2d 1183, 1186 (4th Cir.1986); *East River,* 476 U.S. at 871–73, 106 S.Ct. at 2302–03. "Though the rule has been expressed in different ways, the common underlying pragmatic consideration is that a contrary rule, which would allow compensation for losses of economic advantage caused by the defendant's negligence, would impose too heavy and unpredictable a burden on the defendant's conduct." *Just's, Inc. v. Arrington Constr. Co.,* 99 Idaho 462, 470, 583 P.2d 997, 1005 (1978).

In *Adams–Arapahoe Sch. Dist. v. GAF Corp.,* 959 F.2d 868, 872–73 (10th Cir.1992),

---

**3.** The motion for partial summary judgment is not directed against plaintiff's fraud claim. Although a tort action, an action for fraud is not subject to the rule prohibiting recovery of "eco-

nomic loss" damages. *See 2000 Watermark Ass'n v. Celotex Corp.,* 784 F.2d 1183, 1185 (4th Cir. 1986).

the court applied this rule under Colorado law in the context of asbestos contamination of buildings. As in this case, the plaintiff in *Adams–Arapahoe* sought damages under negligence and strict liability theories for the cost of removing asbestos-containing materials from its buildings. The material in that case was a vinyl asbestos floor tile ("VAT"), which, when left undisturbed, is not considered a friable (easily crumbled) asbestos material. *See infra*, note 12. The plaintiff argued that the VAT material caused three types of injuries: (1) injury from the mere presence of VAT; (2) injury in the nature of the risk inherent in VAT; and (3) injury in the nature of contamination caused by past releases of asbestos fibers from VAT.

The court held that plaintiff's first two claimed injuries were not recoverable under theories of negligence or strict liability. *Adams–Arapahoe*, 959 F.2d at 872–73. As to injury from the mere presence of VAT, the court recognized that "the presence of asbestos in VAT may well impose increased renovation costs" when the plaintiff conducts building renovations that cause the VAT to become friable. *Id.* at 872. Nonetheless, the court held that "any additional expense is best characterized as economic loss—consequential damages resulting from the failure of VAT to meet the [plaintiff's] economic expectations in terms of performance." *Id.* As to plaintiff's claim for damages from the injury inherent in the risk of harm from VAT, the court held that a risk of potential future harm is insufficient to state a tort claim. *Id.* at 872–73. Thus, the court held that the plaintiff could state a claim only for injuries in the nature of past releases of asbestos fibers. *Id.* at 873. *See also City of Greenville v. W.R. Grace & Co.*, 640 F.Supp. 559, 564 (D.S.C.1986) (negligence action available for asbestos contamination that po-

ses a risk of harm to persons or property), *aff'd*, 827 F.2d 975 (4th Cir.1987).

The court believes that the holdings of *Adams–Arapahoe* are consistent with Kansas law. The *Adams–Arapahoe* rule prevents plaintiff from recovering under negligence or strict liability for any costs incurred in order to remove any asbestos-containing material that does not now present an unreasonable risk of harm to building occupants. Unless the material now presents an unreasonable risk of harm during the normal course of building operations, any additional costs incurred during future renovation—inevitable or not—are pure economic loss, which is not recoverable under negligence or strict liability theories. Plaintiff may not recover under these theories for the removal costs of any material that presents only a threat of future, unrealized harm.[4]

Plaintiff does not argue otherwise, but contends that the "inevitability" of compliance with the National Emissions Standards for Hazardous Air Pollutants ("NESHAP"), 40 C.F.R. §§ 61.140 to—.156(m), is an injury that entitles it to recover damages now for the costly control measures it will incur for future renovations or demolition. *See City of Greenville*, 827 F.2d at 981 n. 3 & 982.

Plaintiff alleges that

[d]isturbance and/or deterioration of defendants' asbestos-containing building products over time during normal and reasonably foreseeable building activities has caused and continues to cause the release of asbestos fibers into building environments where they have the potential of being inhaled by building occupants and workers. *Moreover, under federal law, plaintiff is and will be legally required to remove defendants' asbestos products from these buildings, at a substantial cost,*

---

4. Defendants make no attempt to argue that plaintiff may not recover economic damages under the theory of breach of implied warranty. Upon proof of a breach of implied warranty, the plaintiff may recover any direct, as well as incidental and consequential damages. *See International Petroleum Servs. v. S & N Well Serv.*, 230 Kan. 452, 462, 639 P.2d 29, 37 (1982) (costs of replacing a defective product); *see also Professional Lens Plan, Inc. v. Polaris Leasing Corp.*, 234 Kan. 742, 752–53, 675 P.2d 887, 896–97

(1984) (distinguishing between direct and consequential economic loss). The only limitation on damages for a breach of warranty is that the damages proximately result from the breach and be reasonably regarded as within the contemplation of the parties. *Naaf v. Griffitts*, 201 Kan. 64, 67, 439 P.2d 83, 85 (1968). Thus, subject to these limitations, plaintiff may seek to recover under breach of implied warranty for the economic damages associated with the increased costs of renovation. See also footnote 10, *infra*.

*whenever an area of such materials greater [than] 160 square feet is subject to disturbance during renovation or when the building is demolished.*

(Pretrial Order, at p. 21) (emphasis added).

Assuming that such renovations or demolition are inevitable; and further, that compliance with current NESHAP regulations would require plaintiff to incur additional expense during such renovation; and further, that the NESHAP regulations of today will still be in force when these future projects are undertaken, *Adams–Arapahoe* does not allow recovery of these costs under negligence and strict liability theories *unless* removal is required to abate an existing health risk and the additional removal costs are directly related to compliance with NESHAP. *See Clarksville–Montgomery County Sch. Sys. v. U.S. Gypsum Co.*, 925 F.2d 993, 1006 (6th Cir.1991). Thus, NESHAP may affect the measure of plaintiff's damages, if damages are recoverable, but the costs incurred by complying with these regulations do not alone establish an injury for which recovery may be had under negligence or strict liability.[5]

It appears disputed whether and to what extent asbestos-material is actually releasing harmful asbestos fibers in Century II and the Public Library. If harmful fibers presently are being released, they have not resulted in the closure of either facility or in any extraordinary measures for protection of the public. Nevertheless, the court will not dismiss plaintiff's negligence and strict liability claims in their entirety. Consistent with *Adams–Arapahoe*, plaintiff may recover under negligence or strict liability, but only to the extent that plaintiff can prove damages for the removal of asbestos-containing materials that are releasing harmful asbestos fibers during the course of normal building operations.

Therefore, the court grants defendants' motion for partial summary judgment to the extent that plaintiff seeks negligence or strict liability damages for the removal from Century II and the Public Library of asbestos-containing material that poses only a threat of future release of asbestos fibers. The court also grants defendants' motion for partial summary judgment as to such damages claimed as a result of increased costs for any renovations that are not required to abate an existing health risk.

This ruling, in combination with the court's additional ruling, *infra*, sustaining defendants' separate motion for summary judgment on the same claims on statute of limitation grounds, results in the elimination of plaintiff's negligence and strict liability claims as to Century II.

### B. *Implied Warranty*

■ Defendants seek summary judgment on plaintiff's claim of breach of implied warranty, arguing that plaintiff failed to give defendant notice of the claimed breach.

The parties agree that K.S.A. § 84–2–607 is applicable to plaintiff's implied warranty claim. Under this statute, "the buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy; . . . ." *Id.* § 84–2–607(3)(a). The Kansas Comment makes clear that under this provision, "the buyer may waive any claim for defect against the seller by failing to give notice to the seller of any defect." As defendants observe, notice of the alleged breach has been held to be a condition prece-

---

5. As the court understands it, this is essentially the position that plaintiff takes in response to defendant Asbestospray's Second Supplemental Memo. in support of its statute of limitations defense, *see generally* Doc. 266, and in its response to defendants' motion for partial summary judgment. *See* Doc. 272 at pp. 4–8. In the former response, plaintiff states that "[t]he City has never argued that defendants' liability is created by the mere presence of asbestos and the existence of the NESHAP regulations." Doc. 266, at p. 4. Only four months before, however, plaintiff had alleged that "[a]ny building having asbestos in it, *regardless of the level of exposure*, is damaged because of the presence of a federally declared hazardous substance and the remedial measures mandated by federal law." (Plaintiff's Memo. in Support of "Motion for an Order Concerning Its Claim for Removal Costs Damages," Doc. 231, at p. 15; emphasis added). The court is unable to reconcile the two positions. In any event, *Adams–Arapahoe* lays to rest any claim for negligence or strict liability damages based upon the mere presence of asbestos that does not pose any present danger to building occupants.

dent to suit, and the burden is on the party claiming the breach to plead and prove notice within a reasonable time. *Dold v. Sherow,* 220 Kan. 350, 351–52, 552 P.2d 945, 947 (1976). However, this general rule has its exceptions.

The Kansas Court of Appeals has recognized three general purposes served by the notice requirement:

> "First, notice provides the seller a chance to correct any defect. Second, notice affords the seller an opportunity to prepare for negotiation and litigation. Third, notice provides the seller a safeguard against stale claims being asserted after it is too late for the manufacturer or seller to investigate them."

*Carson v. Chevron Chem. Co.,* 6 Kan.App.2d 776, 784, 635 P.2d 1248, 1255 (1981) (citations omitted; quoting *Prutch v. Ford Motor Co.,* 618 P.2d 657, 661 (Colo.1980)). " '[T]he rule of requiring notification is designed to defeat commercial bad faith, not to deprive a good faith consumer of his remedy.' " *Dold,* 220 Kan. at 352, 552 P.2d at 948 (quoting comment 4 to Official UCC Comment).

Plaintiff concedes that prior to filing suit, it did not give notice to defendant. Plaintiff argues, however, that this is not fatal to its claim.

The court agrees. Kansas law requires the court to focus on the purposes of giving notice under the totality of the circumstances. In *Smith v. Stewart,* 233 Kan. 904, 914, 667 P.2d 358, 366 (1983), the Kansas Supreme Court considered whether K.S.A. § 84–2–607(3) was an "absolute bar" to a plaintiff who failed to give pre-suit notice of an alleged breach of express warranty. 233 Kan. at 910, 667 P.2d at 363. The court quoted favorably from several sources indicating that pre-suit notice is not required in all cases. For example, " '[a] comparably strict application of the notice requirement ... may not be appropriate in a case involving a consumer's claim of breach.' " 233 Kan. at 912, 667 P.2d at 365 (emphasis supplied by *Stewart* court; quoting *Armco Steel Corp. v. Isaacson Struct. Steel,* 611 P.2d 507, 513 n. 15 (Alaska 1980)). Thus, " '[t]he defendant's lawyer whose client is sued *not by merchant-buyer but by a consumer,* especial-

ly by a consumer who suffered personal injury or property damage, should not rely heavily on a lack of notice defense.' " *Stewart,* 233 Kan. at 913, 667 P.2d at 366 (emphasis added; quoting White & Summers, *Uniform Commercial Code* § 11–10, at 423 (2d ed. 1980)). In addition, *Stewart* also recognized that "[a] commonly utilized exception to the requirement of giving notice of the defect within a reasonable time is involved in situations where the defective product has caused personal injury." 233 Kan. at 912, 667 P.2d at 365. In these cases, courts typically require no pre-suit notice, because the damage has already been done, and notice would not serve the purpose of allowing the seller to cure the defect. *Id.* at 913, 667 P.2d at 365 (quoting *Maybank v. Kresge Co.,* 302 N.C. 129, 134, 273 S.E.2d 681 (1981)). *See also Graham v. Wyeth Laboratories,* 666 F.Supp. 1483, 1500 (D.Kan.1987) (filing of lawsuit sufficient notice in personal injury action). Because "none of the purposes of the notice within a reasonable time requirement of K.S.A. § 84–2–607(3)(a) [were] served by blind adherence to the generally appropriate 'condition precedent' concept," 233 Kan. at 914, 667 P.2d at 366, the *Stewart* court concluded that plaintiff's express warranty claim was not barred for failure to give pre-suit notice of the defect. Thus, *Stewart* interprets pre-suit notice as a "requirement" only to the extent that notice would serve the underlying purpose of this "condition precedent." *See also Unified Sch. Dist. No. 500 v. U.S. Gypsum Co.,* 788 F.Supp. 1173, 1176 (D.Kan.1992).

As applied to the facts of this case, the courts finds that notice prior to filing suit would have accomplished none of the purposes of K.S.A. § 84–2–607(3)(a). The defect in this case is not restricted to a single instance of improper performance of an otherwise safe product. As alleged in this case and numerous other asbestos-contamination cases across the country involving these same defendants, the defect *is* the product, not because it fails to perform its function as a fire retardant, but rather because it presents a health hazard. Defendants have disputed the health hazard allegation from the outset of this litigation, and it is highly

doubtful that defendants would have utilized earlier notice to cure a defect that they vigorously contend, here and elsewhere, does not even exist.[6] Defendants do not suggest otherwise. Moreover, defendants have not alleged or demonstrated any prejudice to their litigation posture as a result of plaintiff's failure to give earlier notice. Finally, it is significant that plaintiff is not a merchant-buyer, but a consumer, to whom the notice requirement does not strictly apply.

Thus, as to this issue, the court finds no material facts in substantial controversy, Fed.R.Civ.P. 56(d), and concludes as a matter of law that plaintiff's failure to give pre-suit notice does not bar its implied warranty claim.

## II. *Statute of Limitations*

All defendants move for summary judgment on the ground that plaintiff's tort claims are barred by the two-year statute of limitations of K.S.A. § 60–513, which provides, in pertinent part:

"(b) ... the cause of action in this section shall not be deemed to have accrued until the act giving rise to the cause of action first causes substantial injury, or, if the fact of injury is not reasonably ascertainable until some time after the initial act, then the period of limitation shall not commence until the fact of injury becomes reasonably ascertainable to the injured party ..."

Plaintiff contends that defendants may not assert the defense of statute of limitations against a municipality. Plaintiff relies on K.S.A. § 60–521 (1983), which provides:

As to any cause of action accruing to the state, any political subdivision, or any other public body, *which cause of action arises out of any proprietary function or activity,* the limitations prescribed in this article shall apply to actions brought in the name or for the benefit of such public body in the same manner as to actions by private parties, ....

(emphasis added). This statute preserves the case law distinction between "governmental" and "proprietary" functions for purposes of determining the availability of the statute of limitations defense against the state and its subdivisions. *State Highway Comm'n v. Steele,* 215 Kan. 837, 839, 528 P.2d 1242, 1244 (1974). Under § 60–521, the statute of limitations does not run against a governmental unit if the cause of action arises out of a governmental function. *E.g., State ex rel. Stephan v. GAF Corp.,* 242 Kan. 152, 162–63, 747 P.2d 1326, 1333–34 (1987). By contrast, the governmental unit is subject to the statute of limitations applicable to private parties if the cause of action arises out of a proprietary function. *E.g., City of Attica v. Mull Drilling Co.,* 9 Kan.App.2d 325, 327, 676 P.2d 769, 772 (1984).

Plaintiff argues that the plain language of K.S.A. § 60–521 requires the court to focus on whether the *"cause of action* arises out of any proprietary function or activity,...."* (emphasis added). With this much the court can agree. Plaintiff goes on to argue that the "cause of action" which "arises" in this case is the City's remedial action of removing the asbestos *for the protection of public health,* and the City's attempt to recover these costs from potential tortfeasors. Thus, because the stated purpose of this lawsuit is to collect damages relating to the cost of abating a public health hazard, plaintiff contends that its cause of action arises out of a governmental function. *See, e.g., In re Protests of Midland Indus., Inc.,* 237 Kan. 867, 870, 703 P.2d 840, 843 (1985) (protection of public health is governmental function). By relying on K.S.A. 60–521, plaintiff seeks to by-pass the hotly disputed issue of whether its *operation* of the Library and Century II is a proprietary rather than governmental function.

The court cannot agree with this argument. Plaintiff contends, in effect, that a cause of action that arises under K.S.A. § 60–521 is different from its cause of action that arises under K.S.A. § 60–513(b) and therefore that § 60–513(b) simply does not

---

**6.** As indicated in part III, *infra,* U.S. Gypsum has declined to admit that it manufactured the asbestos material found in the Public Library. It

seems doubly doubtful that Gypsum would have agreed to cure the alleged defect.

apply. However, in interpreting K.S.A. § 60–513(b), the Kansas Supreme Court has held that "[t]he terminology 'when a cause of action has arisen' and 'when a cause of action has accrued' are synonymous." *Ruthrauff v. Kensinger*, 214 Kan. 185, 188, 519 P.2d 661, 664 (1974). Moreover, because both K.S.A. § 60–513 and § 60–521 concern the subject matter of statutes of limitations, the court must construe these statutes *in pari materia*. *See Ruthrauff*, 214 Kan. at 188, 519 P.2d at 664. Reading these two statutes in harmony, the cause of action that "arises" under § 60–521 must be the same cause of action that "arises" or "accrues" under § 60–513. Under Kansas law, a cause of action in tort accrues when " 'the *right* to maintain a legal action arises.' " *Admire Bank & Trust v. City of Emporia*, 250 Kan. 688, 698, 829 P.2d 578, 586 (1992) (quoting *Pancake House, Inc. v. Redmond*, 239 Kan. 83, 87, 716 P.2d 575, 578–79 (1986)) (emphasis added). The right arises when the plaintiff is able to ascertain the existence of a substantial, actionable injury. *Roe v. Diefendorf*, 236 Kan. 218, 222, 689 P.2d 855, 859 (1984). Thus, a cause of action under either § 60–513 or § 60–521 arises from the injury inflicted, coupled with the plaintiff's right to remedy that injury in a court of law. K.S.A. 60–521 does not alter this analysis; it merely exempts a governmental plaintiff from the operation of K.S.A. § 60–513 when the cause of action arises out of a governmental, as opposed to, proprietary function or activity.

■ In determining whether a cause of action brought by a municipality arises out of its proprietary or governmental functions, it is proper to focus on the factual and legal elements from which the municipality derives the right to maintain the action—not the concerns that prompted the municipality to exercise that right. Regardless of what motivates the municipality to remedy its known injury, the action itself arises from the *existence* of an injury that the law allows a given plaintiff to remedy through an award of damages. Thus, for purposes of K.S.A. § 60–521, the relevant inquiry is whether the defendant inflicted an injury upon a proprietary or governmental function of the municipality. *See City of Attica v. Mull Drilling Co.*, 9 Kan. App.2d 325, 327, 676 P.2d 769, 772 (1984)

(municipality's claim was proprietary where claimed damages all "relate[d] to the proprietary arm of its dual-purpose functions in *operating* a municipal water supply"; emphasis added); *Unified Sch. Dist. No. 490 v. Celotex Corp.*, 6 Kan.App.2d 346, 351, 629 P.2d 196, 203 (statute did not run against school district because "[t]he *operation* of a high school building by a school board is a governmental function"; emphasis added), *review denied*, 230 Kan. 819 (1981); *City of Osawatomie v. Board of County Comm'rs*, 78 Kan. 270, 272, 96 P. 670, 670–71 (1908) ("the distinction [is] based upon the character of the right asserted").

Plaintiff places considerable reliance on *State ex rel. Stephan v. Brotherhood Bank & Trust Co.*, 8 Kan.App.2d 57, 649 P.2d 419, *review denied*, 232 Kan. 876 (1982). In that case, the court held that the attorney general exercises a governmental function when he files suit pursuant to the Kansas Consumer Protection Act. Although the underlying transaction in such a case involves only private parties, the cause of action that vests in the state is one created by statute and "*arises* out of the duty of the attorney general to enforce the Kansas Consumer Protection Act." *Id.* 8 Kan.App.2d at 62, 649 P.2d at 423 (emphasis in original).

By contrast, plaintiff's right to prosecute this action does not "arise out of" any *parens patriae* authority of the municipality to bring lawsuits on behalf of individual city residents. The City possesses this cause of action by virtue of its own status as the aggrieved party. Plaintiff's right to maintain this action, which defines *this* plaintiff's cause of action, is not grounded in the City's decision to take remedial action of its own. Rather, the cause of action that "accrued" in this case "arises" out of defendants' alleged misrepresentations regarding their allegedly defective products, which resulted in an injury to municipal buildings. Because plaintiff's right to maintain this action does not arise from any governmental duty to prosecute this action, *Brotherhood Bank & Trust Co.* is inapposite.

The Kansas Supreme Court has often lamented the "[s]hadowy distinctions between 'governmental' functions and 'proprietary' af-

fairs," *Wendler v. City of Great Bend*, 181 Kan. 753, 758, 316 P.2d 265, 270 (1957), and the inconsistent results that have obtained from the effort to draw such distinctions. *See Gorrell v. City of Parsons*, 223 Kan. 645, 649, 576 P.2d 616, 619 (1978), *superseded by statute, see Cross v. City of Kansas City*, 230 Kan. 545, 550, 638 P.2d 933, 937 (1982). As plaintiff correctly notes, for each case that denies governmental immunity, there exist cases involving similar activities found to be governmental in nature. Thus, the Kansas appellate courts have characterized the sovereign's activity as "governmental" where a municipality operates a public waterworks that fails to provide adequate pressure to extinguish a fire, *Cross*, 230 Kan. at 549, 638 P.2d at 937, but have found the same activity to be "proprietary" when the municipality sues for salt contamination to its water source. *City of Attica v. Mull Drilling Co.*, 9 Kan.App.2d 325, 327, 676 P.2d 769, 772 (1984). In the same vein, the courts have found the operation of an electrical generating facility to be proprietary, *Seely v. Board of Public Utilities*, 143 Kan. 965, 973, 57 P.2d 471, 476 (1936), whereas the construction and maintenance of a sewer is governmental, *Foster v. Capital Gas & Elec. Co.*, 125 Kan. 574, 265 P. 81 (1928). *See also Harper v. City of Topeka*, 92 Kan. 11, 139 P. 1018 (1914) (maintenance of a public park is governmental); *Krantz v. City of Hutchinson*, 165 Kan. 449, 455, 196 P.2d 227, 231 (1948) (construction of a dike for the protection of a city from floods is proprietary); *Wendler v. City of Great Bend*, 181 Kan. 753, 316 P.2d 265 (1957) (operation and maintenance of a municipal airport is proprietary); *Grover v. City of Manhattan*, 198 Kan. 307, 309, 424 P.2d 256, 258 (1967) (operation of a public zoo is proprietary).

The particular facts upon which the Kansas cases have turned are of little assistance to the court. "It is elementary that each case must be decided upon the facts and circumstances involved in it." *Stolp v. City of Arkansas City*, 180 Kan. 197, 203, 303 P.2d 123, 128 (1956). Thus, the general rules developed from these cases must guide the court's decision.

■ "Ordinarily a municipality is engaged in the performance of a governmental function when it exercises the sovereign power delegated to it to look after the general public good and after the peace, health and well being of the citizens of the state at large." *In re Protests of Midland Indus., Inc.*, 237 Kan. 867, 870, 703 P.2d 840, 843 (1985). By contrast, "[i]t may be said that when a state by itself, or through its corporate creations, embarks on an enterprise which is commercial in character or which is usually carried on by private individuals or private companies, it is engaged in a proprietary enterprise." *Carroll v. Kittle*, 203 Kan. 841, 849, 457 P.2d 21, 28 (1969).

> In determining whether activities of a municipal corporation are governmental or proprietary, it is proper to consider whether the activity is primarily for the advantage of the *state as a whole* or for the *special local benefit* of the community involved, and to further consider whether such activity is in performance of a *duty imposed* upon the municipality by the sovereign power, or is in the exercise of a *permissive privilege* given by the sovereign power, *but such tests are not conclusive* to determine the capacity in which the city's activities are conducted.

*Wendler v. City of Great Bend*, 181 Kan. 753, 316 P.2d 265, syl. ¶ 3 (1957) (emphases in original). Thus, to the extent that the municipal activity is "for the special or immediate profit, benefit, or advantage of the city or town, or the people who compose it, rather than for the public at large, then the city or town is in competition with private enterprise" and the activity will lend itself more readily to a characterization of "proprietary." *Stolp*, 180 Kan. at 202–03, 303 P.2d at 127. In the final analysis, however, "[n]o single test or rule is relied on ... in determining whether activities of a municipal corporation are governmental or proprietary." *Grover v. City of Manhattan*, 198 Kan. 307, 309, 424 P.2d 256, 258 (1967).

In addition, both plaintiff and defendants submit that certain principles of law require the court to look favorably on their respective positions. On the one hand, defendants argue that "the trend of judicial decisions

generally is to restrict rather than to expand the doctrine of municipal immunity." *Wendler*, 181 Kan. at 760, 316 P.2d at 271. On the other hand, plaintiff maintains that such a "trend" is recognized only for those cases addressing governmental immunity from *suit,* rather the governmental immunity from the *statute of limitations.* According to plaintiff, not only is there no trend restricting governmental immunity from the statute of limitations, but "*[a]ll doubts* as to whether the statute of limitations applies to the governmental entity are to be resolved in favor of the governmental entity." (Plaintiff's Response, Doc. 174, at 32; emphasis in original).

The doctrine of sovereign immunity from suit has its origins in the ancient concept of *rex non potest peccare* ("the king can do no wrong"), which has not found favor with either the Kansas courts,[7] or its legislature.[8] Contrasted to immunity of the sovereign from suit is the maxim of *nullum tempus occurrit regi* ("time does not run against the king"), which exempts the sovereign from the bar of the statute of limitations. *See State Highway Comm'n v. Steele*, 215 Kan. 837, 838, 528 P.2d 1242, 1243 (1974) (quoting advisory committee notes to K.S.A. § 60–521). The Kansas cases have recognized this distinction and have stated that the reasons for restricting immunity of the sovereign from suit do not support a restriction of the sovereign's immunity from the statute of limitations. *See State ex rel. Stephan v. GAF Corp.*, 242 Kan. 152, 162–63, 747 P.2d 1326, 1333–34 (1987); *Unified Sch. Dist. No. 490 v. Celotex Corp.*, 6 Kan.App.2d 346, 351, 629 P.2d 196, 203, *review denied*, 230 Kan. 819 (1981).[9]

The court can agree with plaintiff that Kansas has taken a more favorable view of

governmental immunity from the statute of limitations than governmental immunity from suit. Indeed, the importance that Kansas attaches to the preservation of *public* rights from the bar of the statute may be inferred from the enactment of K.S.A. § 60–521, which, by negative implication, retains governmental immunity from the statute of limitations for causes of action arising out of governmental functions. *State Highway Comm'n v. Steele*, 215 Kan. 837, 839, 528 P.2d 1242, 1244 (1974). As plaintiff states, "the doctrine of governmental immunity from statutes of limitation has been and remains supported in modern law by the important policy that *public* rights and causes of action should not be lost by the acts or omissions of public officers." (Plaintiff's Response, Doc. 174, at 38; emphasis in original). *See Guaranty Trust Co. v. United States*, 304 U.S. 126, 132–33, 58 S.Ct. 785, 788–89, 82 L.Ed. 1224 (1938); *City of Shelbyville v. Shelbyville Restorium, Inc.*, 96 Ill.2d 457, 460–63, 71 Ill.Dec. 720, 722–23, 451 N.E.2d 874, 876–77 (1983); *District of Columbia v. Owens–Corning Fiberglas Corp.*, 572 A.2d 394, 409 (D.C. 1989), *cert. denied*, 498 U.S. 880, 111 S.Ct. 213, 112 L.Ed.2d 173 (1990).

*Public* rights, however, are not at issue when a municipality's cause of action arises out of a proprietary function. The court finds no authority for the proposition that the court should resolve "all doubts" in favor of the governmental entity, merely by virtue of that status, on the question of whether its cause of action arises out of a governmental as opposed to proprietary function. Plaintiff attempts to support this proposition with language from *City of Osawatomie v. Board of County Comm'rs*, 78 Kan. 270, 96 P. 670 (1908), where the court stated:

7. *See Carroll v. Kittle*, 203 Kan. 841, 846, 457 P.2d 21, 26 (1969), *superseded by statute, see Brown v. Board of State Fair Managers*, 6 Kan. App.2d 40, 626 P.2d 812 (1981); *cf. Brown v. Wichita State Univ.*, 219 Kan. 2, 5–9, 547 P.2d 1015, 1019–22 (upholding legislative authority to provide for governmental immunity from suit), *appeal dismissed*, 429 U.S. 806, 97 S.Ct. 41, 50 L.Ed.2d 67 (1976).

8. *See Dougan v. Rossville Drainage Dist.*, 243 Kan. 315, 318, 757 P.2d 272, 274 (1988) (under

the Kansas Tort Claims Act, "liability is the rule and immunity the exception").

9. In both *GAF Corp.* and *Celotex Corp.*, the defendants argued that the restrictive judicial view toward state immunity from suit should be applied to bar the claims of the state for *concededly* governmental functions. Although neither court cited K.S.A. § 60–521, their rejection of this argument was the result dictated under this statute and *State Highway Comm'n v. Steele*, 215 Kan. 837, 839, 528 P.2d 1242, 1244 (1974).

"The statute does not run against the state unless expressly so provided, and all doubts as to whether it does so run are to be resolved in favor of the state. This rule extends to minor municipalities created as local governmental agencies *in respect to governmental affairs affecting the general public.*"

*Id.* at 272, 96 P. at 670 (quoting 8 Cur.Law., 770) (emphasis added).

Contrary to plaintiff's belief, neither this nor any other case cited by plaintiff requires the court to grant municipalities a favorable resolution of "all doubts" regarding whether their cause of action arises out of a proprietary or governmental function. The rule of *statutory construction* cited by plaintiff is a rule that does not favor application of time restrictions to the sovereign for its actions arising out of *governmental* functions when it is doubtful whether the legislature intended for time restrictions to bar such actions. *See State v. Dixon,* 90 Kan. 594, 596, 135 P. 568, 569 (1913) ("statutory limitations do not run against the state *when it sues in its sovereign capacity,* unless the statute expressly includes the state or the intention to include the state is shown by the clearest implication"); *State v. Graham,* 12 Kan.App.2d 803, 807, 758 P.2d 247, 251 (1988); *Badaracco v. Commissioner,* 464 U.S. 386, 391, 104 S.Ct. 756, 760, 78 L.Ed.2d 549 (1984). The question presented in this case, however, is *whether* the City's cause of action arises out of a governmental function. If it does, then K.S.A. § 60–521 leaves no room for doubt that the City's action is not subject to the statute of limitations. If it does not, then the two-year statute of limitations under K.S.A. 60–513 comes into play.

The court concludes that no rule of law favors either defendants or plaintiff in determining whether plaintiff's cause of action arises out of a proprietary or governmental function. With these general principles in mind, the court turns to the particular facts of this case.

## A. *Public Library*

■ Public libraries are an established resource for the education of the public, which is an important governmental function not limited to children. *See Smith v. Board of Educ.,* 204 Kan. 580, 584, 464 P.2d 571, 575 (1970) (school building was used for governmental function even though building was also used for adult educational activities not commercial in nature); *Hibbard v. City of Wichita,* 98 Kan. 498, 499, 159 P. 399, 399–400 (1916) (zoological garden kept for pleasure and education of entire public was governmental). Defendants direct the court's attention to no facts that would cast the functions of the Wichita Public Library as a commercial operation or enterprise, or that it is in competition with private enterprise. Although it is relevant that establishment of public libraries is merely a permissive and not mandatory function, this factor alone is not dispositive. *See Grover,* 198 Kan. at 310, 424 P.2d at 259. The court has little difficulty concluding that the operation of the Wichita Public library is a governmental function. Accordingly, the statute of limitations defense is unavailable to defendants as to the Wichita Public Library.

## B. *Century II*

### a. *Immunity from Statute of Limitations*

■ The following facts are not specifically controverted by the plaintiff and are thus deemed admitted. D.Kan.Rule 206(c).

Construction of Century II began in 1966 and was completed in 1969. The facility is staffed by 33 City employees comprised of custodial, maintenance, and office workers. (Plaintiff's Statement of Facts, ¶ 11, at p. 21 Doc. 174). Each year, Century II hosts nearly one million visitors from throughout the State of Kansas and from across the country for various events. (*Id.* ¶ 12). These visitors attend a wide range of educational, cultural, governmental, community and economic development type activities. Among the specific activities and functions hosted in the past are: symphony concerts; ballet; public school music presentations as well as other activities organized by public schools; the Lions convention; the Miss U.S.A. Pageant; commencement activities for the high schools of Wichita and the surrounding communities; private banquets; trade shows; sports events; circus and carnivals; square dancing; exhibitions; and con-

ventions for religious, private, and governmental organizations. There are approximately twenty conventions per year at Century II, including four to six major educational conventions and three to five religious and/or governmental conventions. The remaining conventions can be categorized as agricultural, and/or industrial. (*Id.* ¶¶ 13–15); (Def. Statement of Facts, Doc. 158, ¶ 60, at p. 16).

James Hess, who holds the title of "Century II director" (Def.App.Exh. 28), has prepared a mission statement that defines the goals of Century II. According to Mr. Hess, the general function of Century II is to provide a venue for both public and private events; to provide a meeting space for conventions, meetings, and trade shows; and to provide a space for the performing arts for the cultural enhancement of Wichita. Mr. Hess further states that economic development of Wichita and the State of Kansas is one of the functions of Century II. (Hess Depo., Def.App.Exh. 33, pp. 125–26).

According to James Clancy, the first director of Century II, 99.9% of the persons who use Century II pay a fee for their usage. Currently, between 90% and 95% of users pay a fee. Certain large activities do not pay a fee but are allowed use of Century II because of the economic benefit that is brought to the City of Wichita and the State of Kansas through their programs. (Def. Statement of Facts, ¶ 57, Doc. 158, at 15–16).

Plaintiff has submitted several undisputed facts that relate to the fiscal arrangements by which Century II was established and continues to be maintained. From these facts it can be generally said that the fees collected by Century II are insufficient to support its maintenance; that tax revenue of the City historically and presently subsidizes Century II; and that the revenue generated by Century II goes into the City's general fund to be commingled with other sources of revenue. These facts, although relevant, do not detract from the central issue—which is the nature of the *function* of Century II. *See City of Osawatomie v. Board of County*

*Comm'rs*, 78 Kan. 270, 275, 96 P. 670, 672 (1908) ("the more vital consideration has relation to the character of the power"). In order for a municipal activity to have a proprietary character, "[a]ctual, pecuniary profit or gain is no longer required, but whether or not the activity is commercial in nature is a matter of significance." *Grover v. City of Manhattan*, 198 Kan. 307, 311, 424 P.2d 256, 260 (1967) (citations omitted). Municipal corporations, just as any private corporation, engage in certain activities that standing alone may not show a profit, but this does preclude the possibility that the municipality is "acting for its own private or pecuniary *advantage* and that of its inhabitants, rather than performing a strictly governmental function." *Krantz v. City of Hutchinson*, 165 Kan. 449, 456, 196 P.2d 227, 232 (1948) (emphasis added).

Considering all the factors relevant under Kansas law cast in the light most favorable to plaintiff, the court finds that the operation of Century II is more appropriately characterized as a proprietary function. Although certain economic benefits may flow to the state at large, these benefits appear incidental to the primary commercial benefit inuring to Wichita and its residents. It is also of some significance that operation of Century is not a mandatory function imposed by the sovereign upon the City. The court is mindful that Century II hosts a certain number of school-related events—some of which are schools from the surrounding communities but it is under no mandatory obligation to do so. On the balance, the court is convinced that the predominant function of Century II is to provide commercial benefits to the City of Wichita. Thus, the court finds that as to Century II, plaintiff is subject to the statute of limitations in the same manner that a private party would be subject to the statutory bar.

b. *Application of Statute of Limitations*

 The applicable statute of limitations for plaintiff's tort claims is the two-year period of K.S.A. § 60–513.[10] The parties dis-

---

**10.** Although plaintiff's breach of implied warranty claim is nominally a contract action, K.S.A. § 60–513 applies to this claim to the extent that plaintiff seeks negligence or strict liability damages, i.e., damages for non-economic loss. *See Koch v. Shell Oil Co.*, 815 F.Supp. 1434, 1438 n.

pute the time at which plaintiff's cause of action accrued under this statute.

■ For tort claims such as those alleged by plaintiff, a cause of action

shall not be deemed to have accrued until the act giving rise to the cause of action first causes substantial injury, or, if the fact of injury is not reasonably ascertainable until some time after the initial act, then the period of limitation shall not commence until the fact of injury becomes reasonably ascertainable to the injured party,....

K.S.A. § 60–513(b) (1983 & Supp.1992).[11] Under K.S.A. § 60–513(b) the relevant knowledge is knowledge of when "the act giving rise to the cause of action *first* causes *substantial* injury to the plaintiff," *Dowling v. Southwestern Porcelain, Inc.*, 237 Kan. 536, 541, 701 P.2d 954, 958 (1985) (emphasis added). Thus, it is only the fact of a substantial injury, not its extent, that must be reasonably ascertainable to the injured party. *Brueck v. Krings*, 230 Kan. 466, 470–71, 638 P.2d 904, 907–08 (1982). An injury is "substantial" within the meaning of the statute if the victim has "sufficient ascertainable injury to justify an action for recovery of the damages, regardless of extent." *Roe v. Diefendorf*, 236 Kan. 218, 222, 689 P.2d 855, 859

(1984). The substantiality of an injury may present a question of fact, *see Olson v. State Highway Comm'n*, 235 Kan. 20, 27, 679 P.2d 167, 173–74 (1984).

Plaintiff argues that because this action is for asbestos contamination, a substantial injury occurs only when plaintiff possessed "the ability to ascertain a substantial and unreasonable risk of harm from the release of toxic asbestos fibers at Century II...." (Plaintiff's Response, Doc. 174, at p. 72). *See City of Greenville v. W.R. Grace & Co.*, 827 F.2d 975, 978 (4th Cir.1987) (South Carolina law); *May v. AC & S, Inc.*, 812 F.Supp. 934, 941–42 (E.D.Mo.1993) (Missouri law).

■ The court is aware of no Kansas cases addressing this issue in the context of asbestos contamination. However, it appears well established that the presence of asbestos in a building will support an award of damages in a negligence or strict liability action where the presence of asbestos poses an existing threat of release of toxic asbestos fibers that create a substantial and unreasonable risk of harm to building occupants. *See Adams–Arapahoe Sch. Dist. v. GAF Corp.*, 959 F.2d 868, 872–73 (10th Cir.1992) (citing cases). This formulation is consistent with Kansas strict liability law, which allows a

7 (D.Kan.1993); *Grey v. Bradford–White Corp.*, 581 F.Supp. 725 (D.Kan.1984); *supra* at pp. 854–856. A Kansas implied warranty claim sounds in contract, however, if it seeks damages for economic loss based upon the failure of a product to perform as warranted. *See Winchester v. Lester's of Minnesota, Inc.*, 983 F.2d 992, 995–96 (10th Cir.1993); *Grey*, 581 F.Supp. at 728; *cf. Oller v. Kincheloe's, Inc.*, 235 Kan. 440, 447–48, 681 P.2d 630, 636–37 (1984) ((breach of implied warranty claim may sound in tort or contract at plaintiff's election); *Tamarac Dev. Co. v. Delamater, Freund & Assocs.*, 234 Kan. 618, 622, 675 P.2d 361, 364–65 (1984) (same). The court also notes that a breach of implied warranty claim sounding in contract accrues on the date of the sale, delivery, or installation. *Freeto Constr. Co. v. American Hoist & Derrick Co.*, 203 Kan. 741, 746, 457 P.2d 1, 4 (1969) (applying 3–year period of K.S.A. § 60–512); *Dowling v. Southwestern Porcelain, Inc.*, 237 Kan. 536, 541–42, 701 P.2d 954, 958–59 (1985) (applying 4–year period of K.S.A. § 84–2–725). Because the parties do not address the applicability of these contract statutes of limitations to plaintiff's claims, neither does the court at this time.

11. Defendants raise no argument as to the ten-year limitation contained in the final clause of K.S.A. § 60–513(b). "[B]oth the two-year and ten-year periods of limitation are triggered at the time of substantial injury, unless the *facts* of such injury are not ascertainable until later, in which case the two-year statute of limitations begins at the later date." *Gilger v. Lee Constr., Inc.*, 249 Kan. 307, 314, 820 P.2d 390, 396 (1991) (emphasis added). By "facts" of injury, the Supreme Court apparently means the cause of a known or reasonably ascertainable injury, *id.* at 322, 820 P.2d at 400; *Koch*, 815 F.Supp. at 1438–39, thus allowing the plaintiff a maximum of 10 years from the date of knowledge of the injury in which to discover its cause. *Cf. Speer v. Wheelabrator Corp.*, 826 F.Supp. 1264, 1266–72 (D.Kan.1993) (concluding that K.S.A. § 60–3303(b)(1) displaces § 60–213(b) by allowing plaintiff to prove that a product has a useful safe life of greater than 10 years). Because the only question presented in this case is when the *fact* of injury was known or reasonably ascertainable to plaintiff, both the two-year and ten-year periods are triggered by the same event: actual or constructive knowledge of the fact of a substantial injury.

cause of action against manufacturers for products that are defective in a way that subjects persons or tangible property to unreasonable risks of harm. *See Savina v. Sterling Drug, Inc.*, 247 Kan. 105, 114, 795 P.2d 915, 923 (1990); *Lester v. Magic Chef, Inc.*, 230 Kan. 643, 647–54, 641 P.2d 353, 356–61 (1982) (approving consumer expectation test of unreasonably dangerous). Thus, the issue is when plaintiff first knew, or reasonably should have ascertained, of such a risk of personal harm.

The evidence, viewed most favorably to plaintiff, is that in 1982, Wolfgang Brandner—Regional Asbestos Coordinator for the U.S. Environmental Protection Agency—was invited "to Wichita to aid in the evaluation of asbestos-containing materials in Century II." (Def. Statement of Facts, Doc. 158, ¶ 17); (Doc. 159, Def.App.Exh. 10). Based on his findings, Brandner prepared a report, which plaintiff admits to receiving in September 1986. (Pl. Statement of Facts, Doc. 174, ¶¶ 21–24, pp. 23–24); (Doc. 159, Def. App.Exh. 25). The report identifies three different types of asbestos-containing materials in Century II that are "friable,"[12] i.e., easily crumbled. As of 1985, George Huenergardt—Chief of Air Quality Control for the Wichita–Sedgwick County Department of Community Health—knew that friable asbestos material could release asbestos fibers. (Doc. 159, Def.App.Exh. 23).

There is additional credible, and essentially undisputed, evidence that as early as 1986, plaintiff knew that the presence of asbestos would require remedial attention. Evidence of this knowledge consists primarily of an October 14, 1986 memo written by George Huenergardt to his boss Jack Brown, Chief of the Environmental Quality section of the Wichita–Sedgwick County Department of Community Health. Huenergardt states that it had been his policy to inspect at least annually asbestos-containing areas of Centu-

ry II for signs of deterioration. (Doc. 159, Def.App.Exh. 26, p. 2). Huenergardt had adopted this policy upon the advice of both Brandner and John Irwin—Chief of Environmental Toxicology at the Kansas Department of Health and Environment. Huenergardt recites the "exposure index" figures that Brandner had calculated in 1982, and that Huenergardt himself calculated in 1986, for each of the three areas identified as containing friable asbestos material. Huenergardt acknowledges that, according to guidelines[13] presented by Brandner in 1982, asbestos-containing material in the attic and ceiling of the Century II Convention Hall should be removed. The October 1986 memo continues:

> In my opinion, the condition of the ceiling in Convention Hall has become more deteriorated than when I first observed it. There are many places where the material has fallen. I think it is just a matter of time before something will have to be done. Encapsulation is not a viable solution which leaves removal or enclosure as control measures.
>
> . . . .
>
> Another area needing attention is the whole attic. . . . We should suggest to Century II that all personnel be advised of the asbestos and be required to wear the appropriate safety gear when they must work in the area. Some measures have been taken to prevent disturbing the material but perhaps more enclosure would be appropriate.
>
> It is difficult to say what risk exist for patrons of Century II. I think it advisable that a complete asbestos management plan be developed for Century II.

(Doc. 159, Def.App.Exh. 26, p. 2).

There is further evidence demonstrating the state of plaintiff's knowledge in March 1987. On March 13, 1987 Gary Hammer, a project engineer with HWS Technologies

---

**12.** The EPA defines "friable asbestos" material as "any material containing more than one percent asbestos by weight that hand pressure can crumble, pulverize, or reduce to powder when dry." 40 C.F.R. § 61.142. Plaintiff states that "[t]he asbestos-containing materials in this case fit this definition." (Plaintiff's Memo. in Support of "Motion for an Order Concerning Its Claim

for Removal Costs Damages, Doc. 231, at p. 8 n. 6).

**13.** The court assumes that these are the same EPA guidelines referred to in "Exhibit E" to the December 1988 report of HWS Technologies Inc. (Doc. 175, Pl.App.Exh. 13).

Inc., wrote to James Hess, Director of Century II, regarding asbestos abatement and replacement at Century II. Hammer's March 13, 1987 letter was in response to a request from Hess and advised Hess that "asbestos abatement and replacement work" in the Century II Exhibition and Convention Halls would cost approximately $501,500.[14] (Def. Statement of Fact, ¶ 44, Doc. 158); (Doc. 159, Def.App.Exh. 27). On March 18, 1987, Hess submitted a capital improvements request to the City budget office seeking money for the removal of asbestos-containing materials in the Century II Convention and Exhibition Halls. The total amount of funds requested by Mr. Hess at this time was $515,000. (Doc. 159, Def.App.Exh. 29).

Finally, there is the memo written in April 1987 by Jack Brown to Dan Grohn, Director of Fleet and Buildings for the City's Public Works Department. The subject of the memo is "[a]n evaluation of asbestos containing materials in Century II," which was conducted by Mr. Huenergardt at the request of Mr. Hess. (Doc. 159, Def.App.Exh. 31). Mr. Brown makes several recommendations, including the enclosure or removal of the Convention Hall ceiling "due to its deterioration and potential for public exposure." (Id. at p. 2). Mr. Brown concludes:

> We do not have enough information to determine the extent of health risks to patrons and employee's [sic] of C–II but do feel that *there is the [sic] sufficient evidence to recommend that an aggressive approach be taken to address the management and removal of asbestos containing materials from the structure.*

*Id.* (emphasis added).

Defendants argue from this evidence that plaintiff had knowledge of a substantial injury at least by May 1987,[15] when plaintiff recognized in writing the fact, if not the extent, of a health risk posed by asbestos and requested over one-half million dollars to abate this problem.

Plaintiff raises two arguments in response to defendants' contention that it had sufficient knowledge of an actionable injury at least by May 1987.

First, plaintiff argues that the two-year statute did not begin to run until its city manager and city counsel had sufficient knowledge of a substantial injury from the asbestos in Century II. Plaintiff urges the court to find that this event did not occur until December 1988, when the HWS Technologies, Inc. report was presented to the city manager (Doc. 174, p. 75). Plaintiff contends that report "scientifically identified asbestos debris in the attic and the pathways for such contamination to farther migrate into the facility." [16]

---

14. This figure, which is not disputed by plaintiff, represents an average of low and high estimates. The low estimate of Mr. Hammer totalled $393,000, while the total for the high estimate was $610,000.

15. The court has chosen this date because it is close to the commencement of the two-year statute of limitations. The date offers plaintiff the greatest latitude in terms of evidence favorable to its position. Actually, however, there is a sizeable amount of credible evidence, not all of which is detailed herein, from which a jury could find that plaintiff had substantial knowledge of an asbestos health hazard much earlier.

As noted in *Adams–Arapahoe v. GAF*, 959 F.2d at 870, asbestos in building cases have been litigated since 1982. Plaintiff called in the EPA's regional asbestos coordinator in June 1982. While the court has disregarded the affidavit of the coordinator, Wolfgang Brandner, because he cannot be compelled to testify, the fact remains that plaintiff was sufficiently concerned about asbestos contamination to request the EPA's assistance. The only reasonable conclusion is that its concern was that the asbestos presented at least a potential health hazard. The undisputed evidence of events which occurred after 1982 and before May 1987 indicates a steady increase in plaintiff's concern about, and knowledge of, asbestos contamination in both Century II and the Public Library. There is no contention, and no evidence, that plaintiff was concerned that the asbestos was defective in terms of its fire retardant purpose.

16. Of course, the evidence is disputed whether the presence of asbestos in Century II poses any health risk, substantial or otherwise, even to this day. If no health risk exists, however, then plaintiff has no claim for damages in any event under negligence or strict liability. *See supra* at 854–856. The court notes that the absence of any health risk will not preclude recovery under fraud, to which the economic loss rule does not apply. *Supra* note 3. In effect, plaintiff's fraud action allows it to recover in tort those damages that sound in contract. Nonetheless, although a plaintiff may recover economic loss damages un-

Plaintiff cites no authority for its proposition that the city manager and city counsel must have knowledge of substantial injury before the statute begins to run. Plaintiff notes only that K.S.A. § 12–104 defines the "governing body" of a municipality to be the mayor and council or commissioners, and that § 2.04.060 of the Code of the City of Wichita vests the City Council with authority to employ engineers and other professional consultants. Presumably, however, when the City Council hires persons to conduct the day to day business of the City, it also vests its agents with authority to do those things within the scope of their agency. The court knows of no reason why a municipality acting in its proprietary capacity should not be subject to the same rule of agency that imputes to every principal the knowledge gained by agents acting within the scope of their authority, regardless of whether such knowledge was actually communicated to the principal. *See, e.g., Conner v. Koch Oil Co.*, 245 Kan. 250, 254, 777 P.2d 821, 824 (1989). Thus, contrary to plaintiff's unsupported position, the Kansas Supreme Court has held that a municipality is chargeable with knowledge that its employees did or should have gained in the exercise of their official responsibilities. *See Snyder v. City of Concordia*, 182 Kan. 268, 275–76, 320 P.2d 820, 826–27 (1958) (constructive knowledge of meter reader imputable to the city). *See also Krantz v. City of Hutchinson*, 165 Kan. 449, 461, 196 P.2d 227, 235 (1948) ("If a city is otherwise liable for the acts of its officers and agents it cannot escape such liability merely by omitting to pass an ordinance or formal resolution specifically directing the performance of such acts.").

The persons who possessed the relevant knowledge in this case were not obscure city employees who happened upon information unrelated to tasks normally performed by persons in such positions. James Hess is the Director of Century II, (Hess Depo., Def. App.Exh. 28), and Dan Grohn and his department are responsible for the maintenance and operational condition of Century II. (Doc. 174, Plaintiff's Statement of Facts, ¶ 26, at p. 25). George Huenergardt is Chief of Air Quality Control for the Wichita–Sedgwick County Department of Community Health, and his boss, Jack Brown, is Chief of the Environmental Quality section of the same department. Plaintiff makes no attempt to dispute that these City employees hold positions of significant responsibility to ensure the safe maintenance and operation of Century II. Rather, plaintiff's position appears to be that these persons may delay the accrual of a cause of action indefinitely until they choose to inform the City Council of injuries to the very property over which the City has granted them stewardship, or at least until the City Council discovers such information through its own independent devices. For the reasons stated, the court rejects this position.

Second, plaintiff contends that even if the court rejects its first proposition, the jury must nevertheless decide "when substantial injury first occurred and when it first became reasonably ascertainable to plaintiff ..." (Doc. 174, p. 77). As before, plaintiff relies solely on the report of HWS Technologies, Inc. and rejects defendants' arguments that any or all of the undisputed events occurring prior to May 1987, were sufficient (see pp. 865–866, *supra*).

The court has studied the HWS Technologies report regarding Century II. HWS took one air monitoring sample and concluded that it did not exceed the permissible exposure limit for employees exposed to concentrations of asbestos. It also examined seven different asbestos-containing materials in the building and assessed each for the

---

der fraud, such a claim accrues upon " 'the discovery by the person defrauded of such facts indicating he had been defrauded as would cause a reasonably prudent person to investigate, and which, if investigated with reasonable diligence, would lead to knowledge of the fraud.' " *Wolf v. Preferred Risk Life Ins. Co.*, 728 F.2d 1304, 1306 (10th Cir.1984) (quoting *Wolf v. Brungardt*, 215 Kan. 272, 281–82, 524 P.2d 726, 734 (1974)). Thus, plaintiff's fraud action accrued at the time

it possessed such facts as would have led a reasonable person to the discover that it had been defrauded, and that it had sustained damages recoverable in a fraud action. *See, e.g., Nordstrom v. Miller*, 227 Kan. 59, 65, 605 P.2d 545, 551 (1980) (actionable fraud must result in damage). Plaintiff makes no attempt to argue that the date of accrual for its fraud claim differs from the date of accrual for any potential negligence or strict liability claims.

potential for fiber release and subsequent contamination of the building and/or occupants. It determined that two of the materials needed no immediate action, two needed some form of control (such as encapsulation) pending eventual removal and three needed to be removed as "the only complete solution." The report did not estimate the costs of the its recommendations, perhaps because costs had been addressed in a previous report dated March 13, 1987. These cost estimates were utilized by James Hess in his March 18, 1987, request for $515,000 to be budgeted for the removal and replacement of the ceilings and walls in Century II's convention and exhibition halls. The purpose and justification portion of the request notes: "Because the material contain [sic] a small amount of asbestos, it will be necessary to follow EPA guidelines during its removal, which has a significant impact on the cost. It will also be necessary to do a consultant study to coordinate these requirements determine final costs." Presumably, the 1988 HWS report was that study (except for final costs). The 1988 report identified ceiling and wall insulation as one of the three materials which needed to be removed.

Plaintiff's negligence and strict liability actions accrued when plaintiff learned, or could reasonably have learned, of the existence of an injury that was substantial, in the sense that it was sufficient to justify an action for the recovery of damages. *Supra* at 864–865. Because plaintiff's claim is that asbestos presents a health hazard, plaintiff was entitled to bring an action for the recovery of negligence or strict liability damages at the time that it knew, or reasonably could have ascertained, that the presence of asbestos posed a substantial and unreasonable health risk to building occupants. *Supra* at 865.

The undisputed evidence demonstrates that prior to May 1987, at the latest, plaintiff was aware of a significant asbestos contamination problem in Century II. The court is mindful of the Kansas Supreme Court's statement in *Olson v. State Highway Comm'n*, 235 Kan. at 27, 679 P.2d at 173, that when there is disputed evidence regarding when the fact of injury first became reasonably ascertainable to plaintiff and/or when substantial injury first occurred, a jury question exists. However, it is the fact of substantial injury, not its extent, which controls. *Brueck v. Krings*, 230 Kan. at 470–471, 638 P.2d at 907–08.

The 1988 report, viewed in the light most favorable to plaintiff, demonstrates that the extent of the asbestos problem in Century II was greater than previously thought. The report essentially confirms the earlier conclusion by a responsible city employee who determined in March 1987, that the asbestos problem would require at least $515,000 to resolve. Plaintiff does not argue that $515,-000 is an insignificant expenditure. The court finds that this fact, coupled with the other undisputed facts recited previously, demonstrates that the City's cause of action as to Century II accrued, *at the latest,* in May 1987, by which time the City had knowledge of a substantial, actionable injury caused by asbestos contamination in Century II. There is no sufficient disagreement in the evidence on this issue to require its submission to a jury. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 251–52, 106 S.Ct. at 2511–12. Thus, as to Century II, all claims for damages for negligence and strict liability are barred by K.S.A. § 60–513.

The court emphasizes that this ruling only bars plaintiff's claims to the extent that plaintiff seeks damages under tort theories, which are the only theories governed by K.S.A. § 60–513. Because any damages for economic loss sound in contract, however, *supra* at pp. 854–856, and because the statute does not apply to actions "arising on contract," K.S.A. § 60–513(a)(4), the court will not dismiss plaintiff's implied warranty claim—except to the extent that it is used for the recovery of tort damages. *See supra* note 10. Accordingly, the court denies the motion of all defendants as to plaintiff's implied warranty claim for damages for economic loss to Century II.

III. *Plaintiff's Motion for Partial Summary Judgment* (Doc. 233)

Plaintiff seeks "partial summary judgment on the issue of product identification." According to plaintiff, the material, uncontro-

verted facts establish that U.S. Gypsum manufactured the asbestos-containing acoustical and fireproofing material used in the Public Library.

Rule 56(c) of the Federal Rules of Civil Procedure directs the entry of summary judgment in favor of the party who "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a *judgment* as a matter of law." (emphasis added). Rule 56(a) also permits partial summary judgment in favor of a party seeking judgment on a single claim in a multiple claim action. *See Liberty Mutual Ins. Co. v. Wetzel*, 424 U.S. 737, 742–43, 96 S.Ct. 1202, 1205–06, 47 L.Ed.2d 435 (1976) (quoting *Sears, Roebuck & Co. v. Mackey*, 351 U.S. 427, 435, 76 S.Ct. 895, 899, 100 L.Ed. 1297 (1956)). However,

> [a] party is not entitled to partial summary judgment if the judgment would not be dispositive of the claim. Partial summary judgment may not be invoked to dispose of only part of a claim. *See Westinghouse Electric Corp. v. Fidelity and Deposit Co.*, 63 Bankr. 18, 22 (E.D.Pa. 1986). Summary judgment may be had as to one claim among many, but Rule 56 does not allow a judgment as to one portion of a claim. *Kendall McGaw Laboratories, Inc. v. Community Memorial Hospital*, 125 F.R.D. 420, 421 (D.N.J.1989); *Strandell v. Jackson County, Illinois*, 648 F.Supp. 126, 136 (S.D.Ill.1986); *see* 10A C. Wright, A. Miller & M. Kane, Federal Practice and Procedure § 2737, at p. 457 (2d ed. 1983). The summary judgment rule does not permit the piecemealing of a single claim. *Arado v. General Fire Extinguisher Corp.*, 626 F.Supp. 506, 509 (N.D.Ill.1985); *Newman–Green, Inc. v. Alfonzo–Larrain*, 612 F.Supp. 1434, 1439 (N.D.Ill.1985). Framing a motion as one for partial summary judgment does not cure the defect of moving for judgment on a portion of a claim. *Capitol Records, Inc. v. Progress Record Distributing, Inc.*, 106 F.R.D. 25, 28 (N.D.Ill.1985).

*Connett v. Justus Enters. of Kansas, Inc.*, No. 87–1739–T, slip op. at 15 (D.Kan. filed Jan. 24, 1991) (1991 WL 13076). *See also John Morrell & Co. v. Rural Water Dist. No. 3*, No. 84–1519–C, slip op. at 3 (D.Kan. filed Aug. 20, 1990) (1990 WL 129462); *Commodity Futures Trading Comm'n v. Clothier*, Civ.Action No. 92–1062–B, 1992 WL 123675 (D.Kan. May 29, 1992).

 Rule 56(c) authorizes only the entry of judgments on claims, not single issues or elements that are not dispositive of judgment on those claims. A judicial declaration that defendant U.S. Gypsum manufactured certain asbestos-containing materials in the Public Library will not dispose of any claim for relief made by plaintiff against defendant, but would only resolve the "issue" of product identification. Thus, the present motion requests nothing that the court is authorized to grant under Rule 56(c).

 Nor will the court construe the motion to be made under Rule 56(d), which provides for "an order specifying the facts that appear without substantial controversy,...." This rule does not authorize an independent motion to establish certain facts as true but merely serves to salvage some constructive result from the judicial effort expended in denying a proper summary judgment motion. *Dalton v. Alston & Bird*, 741 F.Supp. 1322, 1336 (S.D.Ill.1990); *Lovejoy Elec., Inc. v. O'Berto*, 616 F.Supp. 1464, 1473 (N.D.Ill.1985); *Arado*, 626 F.Supp. at 509; 10A C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure* § 2737, at 458–59 (2d ed. 1983). As such, "[t]here is no such thing as an independent motion under Rule 56(d)." *Arado*, 626 F.Supp. at 509. The motion will be denied.

## IV. *Conclusion*

Accordingly, the court grants in part and denies in part defendants' motion for partial summary judgment (Doc. 261). The court grants the motion to the extent that plaintiff seeks damages under theories of negligence and strict liability for the cost of removing from Century II and the Public Library asbestos-containing material that poses only a threat of future release of asbestos fiber as well as damages claimed as increased costs for future renovations that are not required to abate an existing health risk. The court denies this motion in all other respects.

In addition, the court grants in part and denies in part the motion of defendants for summary judgment on the ground that plaintiff's claims are barred by the statute of limitations. (Doc. 157). The court grants the motion as to plaintiff's negligence and strict liability claims for the cost of removing asbestos material from Century II to the extent that such material poses an unreasonable risk of harm to building occupants. As to Century II, the motion is denied in all other respects. The motion is denied in its entirety as to all claims for the cost of removing asbestos from the Public Library.

The court denies the motion of plaintiff for partial summary judgment on the issue of product identification (Doc. 233).

Any motions for reconsideration of orders herein shall not exceed 25 pages. Responses shall not exceed 20 pages and replies shall not exceed 10 pages. All page limits include exhibits and attachments. All motions, responses, and replies shall be timely filed in accordance with D.Kan.Rule 206(b), (f).

**IT IS SO ORDERED.**